Martis Ann Alex (SBN 77903)
Daniel R. Leathers *(pro hac vice to be sought)*
Brian R. Morrison *(pro hac vice to be sought)*
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
malex@labaton.com
dleathers@labaton.com
bmorrison@labaton.com

Steve W. Berman *(pro hac vice to be sought)*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

*Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| BERNICE WIMLEY, OSCAR DE LEON, KEVIN SISTI, JR., and MARK PASTARNACK, on behalf of themselves and those similarly situated, | Case No.: 5:15-cv-02434 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | |
| FCA US LLC, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................. 1

II.     PARTIES ............................................................................ 13

        A.      Plaintiffs .................................................................. 13

                1.      California ....................................................... 13

                        a.      Plaintiff Bernice Wimley ............................ 13

                        b.      Plaintiff Oscar De Leon............................... 15

                2.      Connecticut .................................................... 17

                        a.      Plaintiff Kevin Sisti, Jr................................. 17

                3.      New York........................................................ 19

                        a.      Plaintiff Mark Pastarnack ........................... 19

        B.      Defendant ................................................................ 21

                1.      FCA Group ..................................................... 21

                        a.      FCA's Umbrella of Brands ......................... 21

                        b.      The FCA Group............................................ 21

                        c.      Suit Allegations Pertaining to FCA............. 22

                2.      Other Automotive Groups ............................... 22

III.    JURISDICTION.................................................................. 23

IV.     VENUE ............................................................................. 23

V.      FACTUAL ALLEGATIONS ............................................. 24

        A.      The Keyless Fob........................................................ 24

        B.      Without Auto-Off, Keyless Fobs Lead to Carbon Monoxide
                Poisoning .................................................................. 28

        C.      FCA Group has (and had) Actual Knowledge of the Dangerous
                Carbon Monoxide Poisoning Consequences of Vehicles with
                Keyless Fobs that lack Auto-Off through News Reports of
                Injuries and Deaths................................................... 29

        D.      FCA Group has (and had) Actual Knowledge of the Dangerous
                Carbon Monoxide Poisoning Consequences of Vehicles with
                Keyless Fobs that lack Auto-Off through Recalls ........... 34

E.    FCA Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Automaker Patent Applications ................................................................ 36

F.    FCA Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Third-Party Patent Applications ................................................................ 37

G.    FCA Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Personal Injury Lawsuit Filings ................................................................ 40

H.    FCA Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Information in the NHTSA Complaint Database ........................................ 43

I.    FCA Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Various Non-Binding NHTSA Suggestions .......................................... 62

J.    FCA Group has (and had) Actual Knowledge that the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs Can Be Fully Mitigated through the Implementation of Auto-Off ........................................ 64

     a.    The Ford Group has Implemented Auto-Off for *Some* of its Vehicles but has Failed to Implement Auto-Off in *All* of its Vehicles ..................... 65

     b.    The Honda Group has Implemented a *Battery-Saving* Accessory Mode Shut-Down since 2013 but not an *Engine* Auto-Off ........................... 66

     c.    The Vast Majority of the Automakers have Recognized the Danger of Carbon Monoxide by Implementing an Automatic Shut Down System for *Remote-Start* Vehicles but not for *Keyless Fob* Vehicles ........................................ 67

VI.    EXCLUSIVE KNOWLEDGE, CONCEALMENT, AND SAFETY DEFECT ALLEGATIONS ........................................................ 69

VII.   TOLLING OF THE STATUTE OF LIMITATIONS ................................ 74

     A.    Fraudulent Concealment Tolling .................................... 74

     B.    Estoppel ........................................................ 74

     C.    Discovery Rule .................................................. 75

VIII.  CLASS ACTION ALLEGATIONS ............................................ 75

A.   Numerosity & Ascertainability ....................................................... 76

B.   Typicality ....................................................................................... 77

C.   Adequate Representation ............................................................... 77

D.   Predominance of Common Issues................................................... 78

E.   Superiority...................................................................................... 81

IX.   CAUSES OF ACTION .............................................................................. 81

A.   Claims Brought on Behalf of the California Class ......................... 81

FIRST CAUSE OF ACTION Violation of California's
Consumer Legal Remedies Act ("CLRA") (Cal. Civ. Code §
1750, *et seq.*) ................................................................................ 81

SECOND CAUSE OF ACTION Violation of California's
Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et
seq.*) ............................................................................................... 84

THIRD CAUSE OF ACTION Violation of Cal. Civil Code §
1710 Deceit and Common Law Fraud ............................................. 85

FOURTH CAUSE OF ACTION California False Advertising
Law (FAL) (Bus. & Prof Code§ 17500 *et seq.*) ............................ 88

FIFTH CAUSE OF ACTION Unjust Enrichment (Under
California Law, in the Alternative, if the Court Determines the
California Plaintiffs and the proposed California Class have no
Adequate Remedy at Law under the California Plaintiffs' Other
Named Causes of Action) ............................................................... 90

B.   Claims Brought on Behalf of the Connecticut Class ...................... 91

SIXTH CAUSE OF ACTION Violations of the Unfair Trade
Practices Act (Conn. Gen. Stat. Ann. §§ 42-110A, *et seq.*) ........... 91

SEVENTH CAUSE OF ACTION Fraudulent Concealment
(Based on Connecticut Law)............................................................ 93

EIGHTH CAUSE OF ACTION Unjust Enrichment (Under
Connecticut Law, in the Alternative, if the Court Determines
the Connecticut Plaintiffs and the proposed Connecticut Class
have no Adequate Remedy at Law under the Connecticut
Plaintiffs' Other Named Causes of Action)...................................... 94

C.    Claims Brought on Behalf of the New York Class.......................... 95

NINTH CAUSE OF ACTION Violations of New York General
Business Law § 349  (N.Y. Gen. Bus. Law § 349).......................... 95

TENTH CAUSE OF ACTION Breach of Implied Warranty of
Merchantability (N.Y. U.C.C. § 2-314)........................................... 96

ELEVENTH CAUSE OF ACTION Fraudulent Concealment
(Based on New York Law) ............................................................... 97

TWELFTH CAUSE OF ACTION Unjust Enrichment (Under
New York Law, in the Alternative, if the Court Determines the
New York Plaintiffs and the proposed New York Class have no
Adequate Remedy at Law under the New York Plaintiffs' Other
Named Causes of Action) ................................................................ 98

PRAYER FOR RELIEF ...................................................................... 99

DEMAND FOR JURY TRIAL ........................................................ 100

The above-captioned plaintiffs (collectively, "Plaintiffs"), individually and on behalf of all other owners and lessees of vehicles designed, manufactured, distributed, and/or sold by the defendant vehicle manufacturers (the "Class" or "Class Members"), allege the following as their First Amended Class Action Complaint and Demand for Jury Trial:

## I.      INTRODUCTION

1.      This Complaint seeks redress for a deadly defect associated with the remote-control electronic keyless fob system[1] (collectively, "Keyless Fobs") implemented by Defendant FCA US LLC. Defendant FCA US LLC, however, does not stand alone in its implementation of this technology. At least ten different auto manufacturing groups[2] (collectively, the "Automakers" or "Automaker Groups") have implemented functionally identical systems in their respective vehicles.

2.      Keyless Fobs are marketed as the ultimate driving convenience: drivers can keep the Keyless Fob in their pockets or bags and can start the car using the Keyless Fob without having to fumble for a traditional physical key. On rainy days or in cold weather, Keyless Fobs serve a convenient, useful purpose for quickly entering a vehicle.

3.      But, this so-called convenience has produced deadly consequences in the absence of adequate pre-sale warnings. Reasonable drivers, including Plaintiffs, misunderstand the role of the Keyless Fob in turning *off* the vehicle.

---

[1] *See* **Exhibit 1**. Although sometimes called different names by different automakers, Keyless Fobs all work in the same basic manner as it pertains to this suit as described herein. *See id.* (listing the various name designations that the Automakers have assigned to their respective Keyless Fobs).

**Exhibit 1** is the result of hundreds of hours of research and was compiled based on analysis of thousands of pages of sales brochures for each of the more than 1,500 models, submodels, and trim levels listed in **Exhibit 1.** The sales brochures confirm that each makes no mention of the lack of Auto-Off as defined and described herein.

[2] *See* ¶¶ 100-107 (outlining which automotive brands are controlled by which Automaker Group).

Reasonable drivers either mistakenly believe that removing the Keyless Fob from the vehicle turns off the engine or inadvertently fail to do so given the quiet nature of today's automobile engines. That confusion is unsurprising given the ever-changing technologies implemented by each of the Automaker Groups.

4.     Traditionally, vehicle keys were simple (hereinafter, "Physical Keys"). Drivers inserted a Physical Key into the ignition cylinder to turn on the vehicle engine. Drivers took the physical action of turning the key back counter-clockwise to remove the Physical Key, thereby turning the engine off. When a Physical Key was removed from the vehicle, the engine could no longer operate. Drivers took comfort in knowing that if they removed the Physical Key from the vehicle, the engine was off.

5.     Over the course of decades, drivers have associated the presence of the Physical Key with the operation of the vehicle's engine. Each of the Automaker Groups' Keyless Fobs operate contrary to that engrained driver behavior.

6.     The Keyless Fob operates very differently than traditional Physical Keys. Critically, the Keyless Fob *has nothing to do with turning off the engine*. In today's modern vehicles that have implemented Keyless Fobs, engines do not turn off simply because the Keyless Fob is removed from the vehicle, no matter the distance that the Keyless Fob is from the vehicle. For all of the vehicles listed in **Exhibit 1**, a driver can stop the vehicle, put it in park, exit with the Keyless Fob, and the vehicles' engine will still be running no matter how far away the driver goes from the car, and no matter how long the engine is running (hereinafter, the "Affected Vehicles").[3]

---

[3] The list of the Affected Vehicles is attached as **Exhibit 1**. The number of Affected Vehicles is in excess of 5,000,000 vehicles.

7.     Keyless Fobs were first introduced into the market in or about 2003 and are becoming an increasingly common feature in modern cars. A picture of a Keyless Fob is below:



8.     In many vehicles, the Keyless Fob is offered as part of an optional "convenience" or "technology" upgrade package, costing the consumer additional money. In other vehicles, the Keyless Fob is standard equipment with the cost of the hardware and technology built into the vehicle's price. In either case, consumers pay extra for the Keyless Fob feature, which adds additional costs to vehicles for hardware equipment and software development as compared to cars with Physical Keys.

9.     A Keyless Fob allows the driver to start the vehicle's ignition by sending an electronic signal to the vehicle's computer. Once the electronic signal is transmitted, and the vehicle senses the presence of the Keyless Fob, the driver can then press a button to start the engine (the "Start/Stop Button"). A picture of a Start/Stop Button is below:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



10.    The Keyless Fob never needs to come into physical contact with the vehicle in order to start the engine. Instead, a Keyless Fob can remain in the driver's pocket, purse, jacket, or even on the passenger seat or elsewhere in the car and still be used in conjunction with the Start/Stop button to start the engine.

11.    However, the presence of the Keyless Fob is irrelevant to whether the engine is turned off when the car is stopped or parked. To turn off the engine, a driver still must press the Start/Stop Button, regardless of whether the Keyless Fob remains in the vehicle.

12.    In the name of convenience, and at an increased purchase price, each of the Automakers created Keyless Fobs without instituting the adequate safeguard – an automatic engine shutoff to ensure that the vehicle's engine does not continue to run unabated, emitting deadly carbon monoxide. The Automakers failed to properly consider the ramifications of eliminating the physical and psychological connection between the vehicle and Physical Keys.

13.    Upon information and belief, each of the Automakers similarly failed to undertake proper human factors analyses necessary to understand and address the hazards associated with replacing the Physical Key with a Keyless Fob.

14.    As a result, there is an inherent and imminent risk that the millions of drivers, including those who grew accustomed to using a Physical Key to turn off a vehicle—which traditionally was a simple and predictable task—fail to appreciate

that the Keyless Fob plays no role in turning off a Keyless Fob-equipped vehicle's engine. After a driver parks and exits the car, the Keyless Fob could be removed to miles away from the vehicle, and the engine still would not automatically turn off.

15.     Put simply, the Affected Vehicles are defective and unsafe because each of the Automakers, including FCA Group, failed to include a basic safety mechanism whereby its Affected Vehicles, if left unattended with the engine still running, would automatically turn off after a certain period of time (hereinafter, "Auto-Off"). The lack of an Auto-Off system in the Affected Vehicles (hereinafter, the "Defect") is dangerous and defective for the reasons described herein.

16.     Despite the significant change in human interaction required to start and stop the vehicle engine when using Keyless Fobs, many drivers continue to equate Keyless Fobs with Physical Keys. This confusion can result (and has resulted) in deadly consequences as described in detail below.

17.     In a number of incidents, drivers have parked their Affected Vehicles inside their garages, removed the Keyless Fobs, and exited these vehicles only to later discover that the engines never actually turned off. As a result, deadly carbon monoxide—often referred to as the "silent killer" because it is a colorless, odorless, poisonous gas—can fill enclosed spaces and spread to the attached homes. The result has been at least 14 documented deaths and many more serious injuries requiring hospitalization—all from carbon monoxide poisoning, and all of which would have been prevented if the vehicles had Auto-Off.

18.     In just the past month, there have been at least two horrific stories of families that were seriously injured by the Defect, with many of the affected family members narrowly avoiding death. These stories perfectly illustrate that not only are drivers at risk from the Defect, but family members, innocent bystanders, and first responders can also be hospitalized simply because the vehicles were not equipped with Auto-Off. For example:

1          (a)    On October 31, 2015, a mother, Constance Petot returned from

2  a long day at work to her parents' home in the Jacksonville, Florida area, and

3  parked her vehicle in the attached garage. She believed that she had pressed the

4  Start/Stop button in her vehicle to turn off the engine, she closed the garage door,

5  and she went into the house. In the middle of the night, her 13-month-old son woke

6  up screaming. Constance knew something was wrong when she started feeling

7  dizzy and her son went limp in her arms. After walking downstairs, Constance

8  discovered that the vehicle engine was still running. She and her son both received

9  emergency medical treatment, and she subsequently learned that the level of

10  carbon monoxide in the house was high enough to have killed both her and her son

11  if they had remained in the house for only twenty additional minutes;[4] and

12          (b)    On November 7, 2015, in Issaquah, Washington, firefighters

13  were summoned by a neighbor to a household of six, which included two

14  grandparents, two parents, and two children—one child under 10 years old and the

15  other a 17-month-old baby.[5] The father had come home from work and believed he

16  had pressed the Start/Stop button in his Toyota Sienna vehicle to turn off the

17  engine. The Toyota Sienna is an Affected Vehicle. Despite the fact that the

18  family's house had carbon monoxide detectors on every floor, none of the alarms

19  alerted the family to the danger.[6] As a result, all six family members plus three of

20  the first-responder firefighters suffered from carbon monoxide poisoning and

21

---

22     [4] Jodie Fleischer, *2 Investigates: Keyless ignitions harm local families*,

23  Actionnewsjax.com (Nov. 2, 2015),
http://www.actionnewsjax.com/news/news/local/2-investigates-keyless-ignitions-
harm-local-famili/npFPm/ (last visited Nov. 12, 2015).

24     [5] Maria Guerrero, *Carbon monoxide poisoning sends family of six, three

25  firefighters to hospital,* Kirotv.com (Nov. 7, 2015),
http://www.kirotv.com/news/news/carbon-monoxide-poisoning-sends-family-six-
three-f/npJFK/ (last visited Nov. 12, 2015).

26     [6] Janet Kim, *Issaquah family back home after suffering from carbon monoxide

27  poisoning.* Q13 FOX News (Nov. 9, 2015),
http://q13fox.com/2015/11/08/issaquah-family-back-home-after-suffering-from-

28  carbon-monoxide-poisoning/ (last visited Nov. 12, 2015).

---

required hospitalization.[7] The neighbor's call could have been too late, though—the Toyota Sienna minivan fortunately ran out of gas before it could emit enough carbon monoxide to kill everyone in the household.[8] The 17-month-old baby was hospitalized and treated in a hyperbaric chamber with oxygen therapy for three days.[9]

19.     Additionally, in the past three months, another innocent person died from the Defect, putting the total number of confirmed deaths at fourteen, and eight new consumers filed complaints with the National Highway Traffic Safety Administration ("NHTSA") regarding the deadly carbon monoxide poisoning associated with Keyless Fobs. Despite the growing number of deaths and injuries, FCA Group continues to ignore the deadly risk of failing to include Auto-Off in its Affected Vehicles.

20.     Symptoms of carbon monoxide poisoning include headaches, weakness, dizziness, nausea, vomiting, shortness of breath, confusion, blurred vision, and loss of consciousness. Additionally, a victim may suffer irreversible brain damage or death. When an Affected Vehicle is left running in an enclosed environment, such as a garage, the concentration of carbon monoxide in the air can quickly exceed 200 parts per million ("ppm") and rise rapidly. Once carbon monoxide levels rise to 1,600 ppm, persons suffer increased heart rates, dizziness,

---

[7] Carol Garnick, *Issaquah family hospitalized with carbon-monoxide poisoning*, The Seattle Times (Nov. 7, 2015), http://www.seattletimes.com/seattle-news/eastside/issaquah-family-hospitalized-with-carbon-monoxide-poisoning/ (last visited Nov. 12, 2015).

[8] KOMO News Network, *Issaquah family poisoned by carbon monoxide is back home*, KOMOnews.com (Nov. 9, 2015), http://www.komonews.com/news/local/Family-poisoned-by-carbon-monoxide-is-back-home-343260772.html?tab=video&c=y (last visited Nov. 12, 2015).

[9] Sky Valley Chronicle, *Issaquah family treated for carbon monoxide poisoning; Fumes entered the home,* skyvalleychronicle.com (Nov. 8, 2015), http://www.skyvalleychronicle.com/BREAKING-NEWS/ISSAQUAH-FAMILY-TREATED-FOR-CARBON-MONOXIDE-POISONING-BR-Fumes-entered-the-home-2311328 (last visited Nov. 12, 2015).

---

1   and nausea within 20 minutes and death in less than 2 hours. Over thirty-percent of

2   U.S. homes have garages attached to the home.

3       21.     FCA Group was and is aware of the Defect. For example, individuals

4   have filed personal injury and wrongful death lawsuits against several of the

5   Automakers seeking recovery for death or injuries caused by the Defect. Perhaps

6   unsurprisingly, many of those lawsuits have been resolved in confidential

7   settlements. For example:

8           (a)     On June 14, 2011, Kimberlin Nickles filed a wrongful death

9   action against Toyota for the death of her 29-year-old daughter, Chastity Glisson,

10  who died on August 26, 2010, as a result of carbon monoxide poisoning from her

11  2006 Lexus IS 250, an Affected Vehicle.[10] Chastity Glisson parked her Lexus in

12  the garage. Later that night, she collapsed in the third-floor bathroom. Her

13  boyfriend, Timothy Maddock, discovered her body and tried to help her, but then

14  he too succumbed to the carbon monoxide that had by then filled the house and lost

15  consciousness. Tragically, neither Ms. Glisson nor Mr. Maddock was found until

16  the next day. By then, 29-year-old Chastity Glisson had died, and Timothy

17  Maddock was critically injured and required hospitalization for ten days. An

18  investigation revealed that the carbon monoxide that killed Ms. Glisson and

19  severely injured Mr. Maddock came from the Lexus in the garage, which was

20  equipped with a Keyless Fob and, unbeknownst to the occupants of the home,

21  continued to run after the driver exited the vehicle.[11]

22          (b)     On October 29, 2010, Mary Rivera filed a personal injury

23  action against Toyota.[12] The Amended Complaint alleges that Ms. Rivera collapsed

24  and was found barely breathing as a result of carbon monoxide poisoning caused

25

26      [10] *Nickles v. Gables Constr. Inc.*, No. 11013565 (Cir. Ct of the 17th Judicial Cir.,
    Broward Cty., Fla. June 14, 2011).

27      [11] *Id.; see also* ¶ 134(f), *infra*.
        [12] *Rivera v. Toyota Motor, N. Am., Inc.*, No. 1:10-cv-04998, ECF No. 1

28  (E.D.N.Y. Oct. 29, 2010).

by her 2008 Lexus EX 350, which was equipped with a Keyless Fob and which continued to run after the driver left the vehicle.[13] Ms. Rivera is a former college professor who now suffers from permanent brain damage as a result of the carbon monoxide poisoning. Though Ms. Rivera survived the incident, her partner Ernest Cordelia, Jr., who was a long-time attorney and was in the home with Ms. Rivera on the evening of the incident, died with 65 percent carbon monoxide poisoning in his blood according to an autopsy report.[14.]

(c)     Just a few months ago, in the evening of June 14, 2015, two people died as a result of the Defect. Rina and Pasquale Fontanini returned to their home in their 2013 Lincoln MKS. The couple parked their car in the attached garage and either inadvertently forgot to shut down the engine or pushed the Start/Stop button in an effort to do so. The couple then entered their home, but unbeknownst to them the car engine continued to run. Their house filled with deadly carbon monoxide and both Rina and Pasquale were later found dead the next day by their son, a lieutenant in the Highland Park Fire Department.[15] On August 20, 2015, the executrix of the Fontanini's estate filed a wrongful death lawsuit against Ford Motor Company, Lincoln Motor Company, and Libertyville Lincoln Sales, Inc., alleging strict liability arising out of the keyless ignition defect;[16]

---

[13] *Id.* at ECF No. 13.

[14] *See* ¶147. *infra.*

[15] Associated Press, *Carbon Monoxide Death Prompts Questions About Keyless Auto Ignitions,* Northernpublicradio.org. (June 22, 2015), http://northernpublicradio.org/post/carbon-monoxide-death-prompts-questions-about-keyless-auto-ignitions (last visited Aug. 5, 2015).

[16] *Manfredini v. Ford Motor Co., No. 15-L-592 (Cir. Ct. of Lake Cty., Ill, Aug. 20, 2015); see also Robert McCoppin, Suit filed over keyless car for Highland Park couple who were poisoned, Lake County News-Sun (Oct. 6, 2015), http://www.chicagotribune.com/suburbs/lake-county-news-sun/news/ct-keyless-ignition-deaths-lawsuit-met-20151005-story.html (last visited Oct. 6, 2015).*

22.     Consumers have also filed complaints with NHTSA,[17] but FCA Group has failed to take any action in response to the complaints.

23.     A detailed patent search has also revealed that the two largest U.S. Automakers—Ford and General Motors—have openly recognized the dangerous consequences associated with Keyless Fobs. At least one of those patent applications included language about preventing carbon monoxide poisoning in the event that the vehicle engine continues to run after the driver exits the vehicle.

24.     This mounting evidence, as described more fully herein, has been ignored by FCA Group despite each possessing knowledge about the deadly consequences that can result when a driver exits a vehicle with or without the Keyless Fob and without having depressed the Start/Stop button. Nevertheless, even though an Auto-Off feature can be implemented without significant effort or cost, FCA Group has refused to act.

25.     Auto-Off is not only feasible; it has *already* been implemented by Ford and GM in *some* of their recent makes and models to prevent the very tragedies described herein.

26.     The Keyless Fob incidents described throughout this Complaint are unsurprising given modern-day engine technologies. First, the Affected Vehicles lack the tell-tale signs that the vehicle engine is turned on. FCA Group designed its Affected Vehicles to operate quietly with advanced engine vibration mounts, noise and harness reduction engineering, and exhaust baffling. Indeed, each of the Automakers has promoted the fact that their vehicle engines run quietly and smoothly as a marketing feature.[18] Second, hybrid and plug-in hybrid vehicles lack

---

[17] *See* ¶¶ 154-155, *infra; see also* **Exhibit 2**.

[18] *See, e.g.,* **Exhibit 3** (The Buick "LaCrosse is engineered using a QuietTuning process. It's a carefully orchestrated application of sound-reducing, sound-blocking and sound-absorbing measures, including a windshield shaped to minimize turbulence, triple door seals, optimized engine mounts and special sealants.")

*any* tell-tale sign that the engine is running. In either case, consumers, including all Plaintiffs, are left without any clear sign that an Affected Vehicle's engine remains running even after parking the vehicle and removing the Keyless Fob.

27.     In addition to FCA Group's failure to implement Auto-Off in its Affected Vehicles, FCA Group has also failed to take any other adequate precaution to prevent against the dangerous situation of a car parked but left with the engine running. Counsel have collected and analyzed relevant pre-sale vehicle documents for each of the Affected Vehicles, and there are *no warnings* whatsoever in the Affected Automobiles' pre-sale materials to alert consumers of the deadly carbon monoxide risks associated with the Defect in the vehicles they intend to purchase or lease. This safety omission is material to any consumer's decision to purchase or lease a vehicle, including Plaintiffs' decisions.

28.     The resulting carbon monoxide risk is deadly. Affected Vehicles allow colorless and odorless carbon monoxide—the silent killer—to be emitted continually and unabated after the car is parked and the driver exits the vehicle. Those continuous noxious carbon monoxide emissions accumulate, especially in enclosed environments, and are dangerous to human health and potentially fatal.

29.     Because FCA Group has failed to rectify or warn of the Defect in their sales brochures or any other pre-sale materials, or otherwise rectify Affected Vehicles and institute Auto-Off, the Defect has caused carbon monoxide poisoning that has caused at least 14 documented deaths across all of the Automakers and many more serious injuries resulting in hospitalizations, not to mention many "near misses" never reported by media outlets.

30.     FCA Group has failed to take appropriate remedial actions in its Affected Vehicles in order to save lives despite the fact that the Keyless Fob is merely a convenience feature. Keyless Fobs are optional equipment on many

makes and models, and the feature is offered as an expensive upgrade package on many vehicles.[19]

31.     Careful review of all of Affected Vehicle sales brochures reveals that, without exception, FCA Group has omitted the material fact that its Affected Vehicles are Defective and unsafe due to the lack of Auto-Off.

32.     Because of their design, including silent car engines, the Affected Vehicles are susceptible to repeated failures. Each use of an Affected Vehicle may endanger the vehicle occupants, family members, innocent bystanders, and first responders.

33.     The Defect impairs Class Members' proper and safe use of their vehicles, and endangers Class Members and persons near the Affected Vehicle. Class Members have no way to mitigate or change the Affected Vehicles' Keyless Fob functionality to render the vehicles safe. FCA Group has the sole ability to institute a readily-available fix to remedy the Defect in FCA Group's vehicles.

34.     Upon information and belief, and as described more fully below, FCA Group has known of the Defect at all relevant times, yet has repeatedly failed to disclose the Defect to Class Members and the public, and continue to conceal the Defect, including through confidential personal injury settlements. As documented by the deaths and injuries caused by the Defect and as shown throughout this Complaint, the Affected Vehicles are not safe.

35.     Shockingly, and as described below, while some of the Automakers have instituted Auto-Off in *newer* vehicles, they have failed to rectify *older* model vehicles with a basic software update that would provide a permanent Auto-Off remedy for this Defect. And, FCA Group has failed to warn owners, lessees, and drivers of its Affected Vehicles of the deadly safety risk of the Defect.

---

[19] *See* **Exhibit 1** (delineating which makes and models have Keyless Fobs as standard equipment [with the additional technological costs built into the vehicles' sale price] and in which makes, models and trims Keyless Fobs are optional).

36.     As a result of FCA Group's material omissions regarding the Defect, Plaintiffs were harmed and suffered actual damages. Plaintiffs have purchased or leased Affected Vehicles that they would not otherwise have purchased or leased, or would have paid less for had they known of the Defect.

37.     Absent relief from the Court, Plaintiffs and Class Members who drive their Affected Vehicles must also risk serious injury or death associated with the Defect.

38.     Due to the technological nature of the Affected Vehicles, Plaintiffs and Class Members have no ability to rectify the Defect by any means, including through independent auto repair shops. The programing of the Affected Vehicles and the Keyless Fobs are controlled by FCA Group's proprietary software. In short, Plaintiffs and Class Members are unable on their own to cure the Defect through any means. The risk associated with the Defect is therefore capable of repetition at any time. FCA Group is the only party that can institute Auto-Off in its respective Affected Vehicles.

## II.     PARTIES

**A.     Plaintiffs**

39.     All Plaintiffs have been harmed, including purchasers and lessees of Affected Vehicles. First, Plaintiffs have each inadvertently left the Affected Vehicles' engines running, and therefore have experienced the Defect first-hand. Second, Plaintiffs overpaid for the purchased or leased Affected Vehicles since the cost of the defective Keyless Fobs was included in the vehicle's price. Third, because defective vehicles are worth less than vehicles without defects, Plaintiffs' Affected Vehicles have diminished in value.

**1.     California**

**a.     Plaintiff Bernice Wimley**

40.     Plaintiff Bernice Wimley is, and at all times relevant to this Complaint was, a citizen and resident of California.

41.     Plaintiff purchased a 2011 Dodge Durango, an FCA Group vehicle, without knowledge of the Defect in or about December 2013, at San Bernardino Dodge - Moss Bros in San Bernardino, California.

42.     Plaintiff paid approximately $21,000 for her vehicle.

43.     Plaintiff's vehicle bears the VIN # 104RD4GG6BC729274.

44.     Plaintiff's vehicle is an Affected Vehicle.

45.     Plaintiff purchased the Dodge Durango primarily for personal, family, and household use.

46.     Prior to purchasing the vehicle, Plaintiff reviewed marketing materials from FCA Group, including FCA Group's/manufacturer's information provided on its website regarding the vehicle.

47.     None of FCA Group's pre-sale materials reviewed by Plaintiff contained any information that her vehicle lacked Auto-Off or that the lack of Auto-Off poses a serious safety risk.

48.     A representative example of the pre-sale marketing materials distributed to consumers, like Plaintiff Bernice Wimley, includes the sales brochure. The sales brochure of Plaintiff's 2011 Dodge Durango is attached as **Exhibit 4**. The sales brochure fails to state that the vehicle lacks Auto-Off and that the lack of Auto-Off poses a safety risk.

49.     Plaintiff removed the Keyless Fob and parked the vehicle in her enclosed garage, only to later discover that the engine was still running.

50.     In light of this incidents, Plaintiffs is now concerned about the lack of Auto-Off in the vehicle.

51.     Plaintiff Bernice Wimley, at the time of her purchase and at the time of the incident stated herein, did not know that Auto-Off was an available technology that would have remedied the Defect and removed the risk of deadly safety consequences.

52.     Plaintiff's injury and risk of future harm is capable of repetition because she is powerless and technically unable to institute an Auto-Off function in her vehicle; only FCA Group can institute Auto-Off in her vehicle. Plaintiff therefore is realistically threatened by a repetition of the Defect because Plaintiff intends to continue to drive her vehicle as her primary mode of vehicular transportation.

53.     FCA Group's omission of information about the Defect was material because Plaintiff Bernice Wimley would not have purchased or would have paid less for the vehicle had she known of the Defect prior to purchase.

54.     Plaintiff would have paid less for the vehicle because she paid extra for a vehicle equipped with a Keyless Fob that is more costly than a comparable vehicle with a traditional Physical Key. The additional price paid for the Affected Vehicle that lacks Auto-Off was passed on from the FCA Group to consumers, including Plaintiff. Plaintiff has therefore conferred a benefit to the FCA Group.

**b.     Plaintiff Oscar De Leon**

55.     Plaintiff Oscar De Leon is, and at all times relevant to this Complaint was, a citizen and resident of California.

56.     Plaintiff bought a 2014 Dodge Charger, an FCA Group vehicle, without knowledge of the Defect on or about July 5, 2014 at Hooman Dodge in Los Angeles, California.

57.     Plaintiff paid approximately $29,000 for the purchase price of his vehicle.

58.     Plaintiff's vehicle is an Affected Vehicle without Auto-Off.  The VIN No. is 2C3CDXBG2EH198625.

59.     Plaintiff purchased the 2014 Dodge Charger primarily for personal, family, and household use.

60.     Prior to purchasing the vehicle, Plaintiff reviewed marketing materials from FCA, such as Dodge's website pages for the vehicle.

61.     None of FCA Group's pre-sale materials reviewed by Plaintiff contained any information that his vehicle lacked Auto-Off or that the lack of Auto-Off poses a serious safety risk.

62.     A representative example of the pre-sale marketing materials distributed to consumers, like Plaintiff Oscar De Leon, includes the sales brochure. The sales brochure of Plaintiff's 2014 Dodge Charger is attached as **Exhibit 15**. The sales brochure fails to state that the vehicle lacks Auto-Off and that the lack of Auto-Off poses a safety risk.

63.     On at least one occasion, Plaintiff's vehicle inadvertently continued to run after Plaintiff parked and exited the vehicle.   While walking away, he noticed that the car hadn't turned off; he then returned to the vehicle and turned it off.  The smell from the exhaust was easily smelled in the large garage.

64.     Plaintiff Oscar De Leon is concerned about the lack of Auto-off in his vehicle.

65.     Plaintiff Oscar De Leon, at the time of his purchase, and at the time of the incident stated herein, did not know that Auto-Off was an available technology that would have remedied the Defect and removed the risk of deadly safety consequences.

66.     The presence (or lack thereof) of Auto-Off, and pre-sale information about Auto-Off, is material to Plaintiff because without it, he has no ability to add the life-saving technology on his own.

67.     Plaintiff's injury and risk of future harm is capable of repetition because he is powerless and technically unable to institute an Auto-Off function in his vehicle; only FCA Group can institute Auto-Off in his vehicle. Plaintiff therefore is realistically threatened by a repetition of the Defect because Plaintiff intends to continue to drive his vehicle as his primary mode of vehicular transportation.

68.     FCA Group's omission of information about the Defect was material because Plaintiff Oscar De Leon either would have paid less for his vehicle or would not have purchased it had he known of the Defect prior to the purchase.

69.     Plaintiff would have paid less for the vehicle because he paid extra for a vehicle equipped with a Keyless Fob that is more costly than a comparable vehicle with a traditional Physical Key. The additional price paid for his Affected Vehicle that lacks Auto-Off was passed on from the FCA Group to consumers, including Plaintiff De Leon. Plaintiff has therefore conferred a benefit to the FCA Group.

**2.     Connecticut**

**a.     Plaintiff Kevin Sisti, Jr.**

70.     Plaintiff Kevin Sisti, Jr. is, and at all times relevant to this Complaint was, a citizen and resident of Connecticut.

71.     Plaintiff leased a 2014 Jeep Grand Cherokee, an FCA Group vehicle, without knowledge of the Defect on or about July 13, 2013, at Papa's Chrysler Dodge Jeep Ram in New Britain, Connecticut.

72.     Plaintiff pays approximately $369.50 per month for his vehicle lease.

73.     Plaintiff's vehicle bears the VIN # 1C4RJFBGWEC196469.

74.     Plaintiff's vehicle is an Affected Vehicle.

75.     Plaintiff leased the Jeep Grand Cherokee primarily for personal, family, and household use.

76.     Prior to leasing the vehicle, Plaintiff reviewed marketing materials from FCA Group, including:

(a)     FCA's/manufacturer's sales brochure for the vehicle;

(b)     FCA's/manufacturer's sales information provided on the dealership showroom floor for the vehicle;

(c)     FCA's/manufacturer's television advertisements for the vehicle;

(d)     FCA's/manufacturer's newspaper advertisements for the vehicle; and

(e)     FCA's/manufacturer's information about the vehicle as provided on the manufacturer's website.

77.     None of FCA Group's pre-sale materials reviewed by Plaintiff contained any information that his vehicle lacked Auto-Off or that the lack of Auto-Off poses a serious safety risk.

78.     A representative example of the pre-sale marketing materials distributed to consumers, like Plaintiff Kevin Sisti, Jr., includes the sales brochure. The sales brochure of Plaintiff's 2014 Jeep Grand Cherokee, is attached as **Exhibit 5**. The sales brochure fails to state that the vehicle lacks Auto-Off and that the lack of Auto-Off poses a safety risk.

79.     On more than one occasion, Plaintiff removed the Keyless Fob and parked the vehicle at his house, only to later discover that the engine was still running when he returned to the vehicle.

80.     In light of these incidents, Plaintiff is now concerned about the lack of Auto-Off in the vehicle.

81.     Plaintiff Kevin Sisti, Jr., at the time of his lease and at the time of the incidents stated herein, did not know that Auto-Off was an available technology that would have remedied the Defect and removed the risk of deadly safety consequences.

82.     Plaintiff's injury and risk of future harm is capable of repetition because he is powerless and technically unable to institute an Auto-Off function in his vehicle; only FCA Group can institute Auto-Off in his vehicle. Plaintiff therefore is realistically threatened by a repetition of the Defect because Plaintiff intends to continue to drive his vehicle as his primary mode of vehicular transportation.

83.    FCA Group's omission of information about the Defect was material because Plaintiff Kevin Sisti, Jr. would not have leased or would have paid less for the lease had he known of the Defect prior to leasing.

84.    Plaintiff would have paid less for the vehicle because he paid extra for a vehicle equipped with a Keyless Fob that is more costly than a comparable vehicle with a traditional Physical Key. The additional price paid for the Affected Vehicle that lacks Auto-Off was passed on from the FCA Group to consumers, including Plaintiff. Plaintiff has therefore conferred a benefit to the FCA Group.

**3.    New York**

        **a.    Plaintiff Mark Pastarnack**

85.    Plaintiff Mark Pastarnack is, and at all times relevant to this Complaint was, a citizen and resident of New York.

86.    Plaintiff leased a 2013 Dodge Journey, an FCA Group vehicle, without knowledge of the Defect in the month of December, 2013, at White Plains Dodge Jeep in White Plains, New York.

87.    Plaintiff pays approximately $454 per month for his vehicle lease.

88.    Plaintiff's vehicle bears the VIN # 3C4PDDEG1DT646303.

89.    Plaintiff's vehicle is an Affected Vehicle.

90.    Plaintiff leased the Dodge Journey primarily for personal, family, and household use.

91.    Prior to leasing the vehicle, Plaintiff reviewed marketing materials from FCA Group, including:

        (a)    FCA/manufacturer's sales brochure for the Dodge Journey, and

        (b)    FCA/manufacturer's television advertisements for the Dodge Journey.

92.    None of FCA Group's pre-sale materials reviewed by Plaintiff contained any information that his vehicle lacked Auto-Off or that the lack of Auto-Off poses a serious safety risk.

93.     A representative example of the pre-sale marketing materials distributed to consumers, like Plaintiff Mark Pastarnack, includes the sales brochure. The sales brochure of Plaintiff's 2013 Dodge Journey is attached as **Exhibit 6**. The sales brochure fails to state that the vehicle lacks Auto-Off and that the lack of Auto-Off poses a safety risk.

94.     Plaintiff parked the vehicle on at least four occasions believing he had turned the vehicle off because of lack of engine noise or any other indication that the engine remained on. After the first two times this occurred, plaintiff became concerned and began to double or even triple-check that the engine was off, including feeling the hood of the vehicle. Nevertheless, because of the quiet engine, on at least two additional occasions, the engine was left running after he exited the vehicle with the Key Fob, due to the Defect. On at least one occasion, the engine remained running for at least three hours.

95.     In light of these incidents, Plaintiff is now concerned about the lack of Auto-Off in the vehicle.

96.     Plaintiff Mark Pastarnack, at the time of his lease and at the time of the incidents stated herein, did not know that Auto-Off was an available technology that would have remedied the Defect and removed the risk of deadly safety consequences.

97.     Plaintiff's injury and risk of future harm is capable of repetition because he is powerless and technically unable to institute an Auto-Off function in his vehicle; only FCA Group can institute Auto-Off in his vehicle. Plaintiff therefore is realistically threatened by a repetition of the Defect because Plaintiff intends to continue to drive his vehicle as his primary mode of vehicular transportation.

98.     FCA Group's omission of information about the Defect was material because Plaintiff Mark Pastarnack would not have leased or would have paid less for the lease of the vehicle had he known of the Defect prior to the lease.

99.     Plaintiff would have paid less for the vehicle because he paid extra for a vehicle equipped with a Keyless Fob that is more costly than a comparable vehicle with a traditional Physical Key. The additional price paid for the Affected Vehicle that lacks Auto-Off was passed on from the FCA Group to consumers, including Plaintiff. Plaintiff has therefore conferred a benefit to the FCA Group.

**B.    Defendant**

**1.    FCA Group**

**a.    FCA's Umbrella of Brands**

100.    Defendant FCA US LLC ("FCA") is a Delaware Limited Liability Corporation whose principal place of business is 1000 Chrysler Drive, Auburn Hills, MI 48326. FCA's registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange St, Wilmington, DE, 19801.

101.    FCA manufactures, markets, and distributes Affected Vehicles sold under a variety of different brand names: Chrysler, Jeep, Dodge, and RAM. The principal places of business and registered agent for service of process for any of these four brands is identical to that of FCA's.

**b.    The FCA Group**

102.    FCA, through its various entities, designs, manufactures, markets, distributes and sells Chrysler-, Jeep-, Dodge-, and RAM-brand automobiles in California and multiple other locations in the United States and worldwide.

103.    Defendant FCA (including its Chrysler, Jeep, Dodge, and RAM-branded vehicles) is herein referred to as the "FCA Group."

104.    Each of FCA Group's Keyless Fob systems work in substantially the same if not identical manner across all of the Affected Vehicles that the FCA Group produces

c. **Suit Allegations Pertaining to FCA**

105. This suit is seeking relief only as to vehicles manufactured on or after June 10, 2009, the date, upon information and belief, that FCA's predecessor companies emerged from bankruptcy.

106. To the extent that any claim could be interpreted as including any claims relating to any vehicles pre-bankruptcy-resolution, those claims are expressly *not* brought here.

2. **Other Automotive Groups**

107. Although this Complaint is brought solely against the FCA Group, numerous other Automakers have instituted Keyless Fobs in their vehicles.[20] The following is a list of Automakers that have implemented Keyless Fobs and, though not named in this Complaint, are referenced throughout because of FCA Group's knowledge of these other Automakers' actions (and inactions):

(a) the "Toyota Group," comprised of Toyota Motor Sales, U.S.A., Inc., which designs, manufactures, markets, distributes and sells Toyota- and Lexus-branded automobiles in the U.S.;

(b) the "Ford Group," comprised of Ford Motor Company, which designs, manufactures, markets, distributes and sells Ford- and Lincoln-branded automobiles in the U.S.;

(c) the "Nissan Group," comprised of Nissan North America, Inc., which designs, manufactures, markets, distributes and sells Nissan- and Infiniti-branded automobiles in the U.S.;

(d) the "Honda Group," comprised of American Honda Motor Co., Inc., which designs, manufactures, markets, distributes and sells Honda- and Acura-branded automobiles in the U.S.;

---

[20] For the full list of all Affected Vehicles for each Automaker Group, *see* **Exhibit 1.**

1    (e) the "GM Group," comprised of General Motors Company,

2 which designs, manufactures, markets, distributes and sells GMC-, Chevrolet-,

3 Cadillac-, and Buick-branded automobiles in the U.S.;

4    (f) the "BMW Group," comprised of BMW of North America,

5 LLC, which designs, manufactures, markets, distributes and sells BMW- and Mini-

6 branded automobiles in the U.S.;

7    (g) the "VW Group," comprised of Volkswagen Group of America,

8 Inc., which designs, manufactures, markets, distributes and sells Volkswagen- and

9 Audi-branded automobiles in the U.S.;

10    (h) the "MB Group," comprised of Mercedes-Benz USA, LLC,

11 which designs, manufactures, markets, distributes and sells Mercedes Benz-

12 branded automobiles in the U.S.; and

13    (i) the "Hyundai/Kia Group," comprised of comprised of Hyundai

14 Motor America, Inc. and Kia Motors America, Inc., which collaborate and design,

15 manufacture, market, distribute and sells Hyundai- and Kia-branded automobiles in

16 the U.S.

### III. JURISDICTION

18   108. Jurisdiction is proper in this Court pursuant to the Class Action

19 Fairness Act, 28 U.S.C. § 1332(d).

20   109. This is a class action. Some of the members of the proposed Plaintiff

21 Class are citizens of states different from the Automakers' home states.

22   110. Upon information and belief, aggregate claims of individual Class

23 Members exceed $5,000,000, exclusive of interest and costs. *See* 28 U.S.C. §

24 1332(d)(2).

25   111. The number of members of all proposed plaintiff classes in the

26 aggregate is 100 members or greater. *See* 28 U.S.C. § 1332(d)(5)(B).

### IV. VENUE

28   112. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

113.   In addition, a substantial part of the events or omissions giving rise to these claims occurred in this district.

114.   The California-resident plaintiffs' Venue Declarations pursuant to Cal. Civ. Code § 1780(d) are attached hereto as **Exhibits 13 through 14**.

## V.   FACTUAL ALLEGATIONS

115.   Plaintiffs bring this action for themselves and on behalf of all Class Members. Plaintiffs are informed and believe that, because of the Defect—the lack of Auto-Off in the Affected Vehicles—all such Affected Vehicles have a dangerous propensity to cause carbon monoxide poisoning, placing Plaintiffs and the Class Members at undue risk of suffering physical injury and death due to carbon monoxide poisoning. This risk of imminent injury is caused by the Defect in conjunction with FCA Group's failure to provide warnings about the Defect in pre-sale materials, and/or supply funds to retrofit and/or repair the dangerously defective Affected Vehicles, and/or buy back the Affected Vehicles.

116.   Affected Vehicles at issue in this action are described in detail in **Exhibit 1**. FCA Group can readily ascertain and identify all Affected Vehicles by Vehicle Identification Number ("VIN") and/or specification sheets to discern which Affected Vehicles were optioned with or had the Keyless Fob as standard equipment. Department of Motor Vehicle registries readily identify those with Affected Vehicles.

117.   Plaintiffs reserve the right to amend the definition and list of Affected Vehicles should further discovery reveal that additional models, model-years, and model variations and trim levels are affected by the Defect.

## A.   The Keyless Fob

118.   Over the past decade, an increasing number of vehicles in the United States are being sold with Keyless Fobs. Keyless Fobs function without ever touching the vehicle (e.g., the Keyless Fob can remain in the driver's pocket or purse throughout operation of the vehicle).

119.   Affected Vehicles with Keyless Fobs have several features that differentiate them from vehicles that use Physical Keys. First, vehicles with Keyless Fobs have a "Start/Stop" button on the dashboard, center console, or shifter mechanism, rather than an ignition slot that accepts a Physical Key that is used to start the engine. Second, the Affected Vehicles have a transponder (the Keyless Fob) that contains the circuitry that sends an electronic signal, rather than a conventional Physical Key with teeth.

120.   FCA Group sells vehicles in the United States that are equipped with Keyless Fobs. As noted in **Exhibit 1**, though each of the Automakers name the Keyless Fobs using various catch-phrases such as "Intelligent Keys" or "SmartAccess," the Keyless Fobs are functionally the same when it comes to this Complaint's allegations regarding the Defect and the lack of Auto-Off.

121.   Over the years, the makes and models of automobiles with Keyless Fobs have risen dramatically:



122.   As noted, over the course of decades, drivers have associated the presence of the Physical Key with the operation of the vehicle's engine. Each of the Automaker Groups' Keyless Fobs has significantly altered the driver behavior required to turn the vehicle on and off.

123.   FCA Group has failed to take into account the monumental shift of user behavior required when moving from a Physical Key, when the engine is *always* off if the Physical Key is removed, to a Keyless Fob, which has *nothing* to do with turning off the engine.

124.   As noted in the treatise "The Safety Promise and Challenge of Automotive Electronics" published by the National Research Council of the National Academies in 2012,[21]

> A further challenge in today's electronics-intensive vehicle relates to the interactions between the driver and the vehicle. As electronics-driven systems with new behaviors and interfaces are introduced at a faster pace, the driving experience can change, and some drivers may be surprised by certain vehicle behaviors that are normal for the new system. The unfamiliar driver may respond in a way that causes safety problems. Similarly, a startled or stressed driver may not react properly when faced with an unexpected condition. **For example, the means for shutting off the engine while driving when a vehicle has a keyless ignition system (push button) has been suspected to be misunderstood by drivers accustomed to the traditional keyed ignition switch.** Thus, human factors, which have always been important in the design of vehicles, will grow in significance as new systems affecting the driver's interfaces and interactions with the vehicle are introduced.[22]

125.   An August, 2011, Department of Transportation publication pointed to the disconnect that occurs when there is a change to engrained routine behaviors:

> **Whenever a special situation requires an operator to perform a rarely-used procedure to achieve a result normally reached through a familiar procedure, there is a chance that the mind will slip into the familiar procedure. especially if fear, distraction, and/or fatigue are also present.** For example, flight instructors have noted that pilots who are in transition training from

---

[21] Transportation Research Board, National Research Council of the National Academies (2012), http://www.omg.org/hot-topics/documents/Safety-Promise-and-Challenge-of-Automotive-Electronics-TRB-2012.pdf (last visited Nov. 12, 2015) (emphasis added).

[22] *Id.* at 64-65.

one aircraft type to another will sometimes use procedures appropriate to their previous aircraft, even after they have already passed a test demonstrating knowledge of the correct procedures for the new aircraft. This phenomenon is particularly likely to occur in moments of very high mental workload. The terms 'habit-pattern errors' and 'reversion of habituated behaviors' are used to describe this experience.[23]

126.    And an even earlier publication in February, 2006, from the United Kingdom's Transport Research Laboratory entitled "Design Guidelines For Safety of In-Vehicle Information Systems" explains that its "recommendations [are] to assist designers, manufacturers, suppliers and installers regarding safety-related issues affecting systems used by drivers in-transit."[24] The publication overviews key human factors design considerations. Specifically, the publication states:

Another safety concern for IVIS [in-vehicle information systems] is behavioural adaptation; as drivers become more familiar and experienced with a particular system they may adapt / modify the way in which they interact with it and the information it provides.

The Organisation for Economic Co-operation and Development (OECD, 1990), refers to behavioural adaptation as those " ... behaviours which may occur following the introduction of changes to the road-vehicle-user system and which were not intended by the initiators of the change". **Designers should consider that potential safety benefits and behavioural impact of new in-vehicle systems may be reduced by behavioural adaptation**; for example, drivers may consider using route guidance systems to help them find their way in fog when without the IVIS they would not travel.

In this context the more advanced and sophisticated the system - and the more useful information it offers the driver - the more such adaptation and reliance will

---

[23] United States Department of Transportation, Research and Innovative Technology Administration, R*eview of SAE RP J2948 JAN2011: Keyless Ignition Control Design* (August 2011), at 2-3 (emphasis added).

[24] A. Stevens, A. Quimby, A. Board, T. Kersloot, and P. Burns, *Design Guidelines For Safety of In-Vehicle Information Systems*. Transport Research Laboratory, at 6, http://www.transport-research.info/Upload/Documents/200607/20060728_165141_88073_UG340_Final_Report.pdf (last visited Nov. 12, 2015).

become a factor. The only effective way of assessing - or evaluating - such concerns are by instigating long-term trials.[25]

127.    Upon information and belief, FCA Group regularly reviews publications related to automotive safety, especially as it pertains to in-vehicle information systems and human interactions with each of the Automaker's systems. Thus, FCA Group had actual knowledge of the dangerous safety risks associated with changes to in-vehicle information systems – including the shift from the Physical Key to the Keyless Fob.

**B.    Without Auto-Off, Keyless Fobs Lead to Carbon Monoxide Poisoning**

128.    Unfortunately and inexplicably, FCA Group has failed to implement an updated safety feature to prevent the Defect in its Affected Vehicles. In these vehicles, a driver may place the car into park but may inadvertently fail to turn off the Affected Vehicle's engine. The Defect exists because the Affected Vehicle can emit dangerous (if not deadly) levels of carbon monoxide, especially if left running in an enclosed environment, such as an attached garage.

129.    In some instances, the engine may continue to run *even if the driver pushes the Start/Stop button*. For example, in a recent recall, the Ford Group recalled 432,096 vehicles, including the 2015 model year Escape, Focus, and C-Max models equipped with Keyless Fobs because, according to the official recall report:[26]

> **Description of the Noncompliance:** On your vehicle, it may be possible for the engine to continue to run after turning the ignition key to the "off" position and removing the key (vehicles with standard ignition keys), or after pressing the Engine Start/ Stop button (vehicles with push-button start and intelligent access keys).

---

[25] *Id.* at 38 (emphasis added).

[26] Non-Compliance Notice, July 1, 2015, www.nhtsa.dot.gov, http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM481952/RCLRPT-15V436-2235.PDF.

130.   In other words, because of software glitches that affected nearly one-half of one-million vehicles, depressing the "Start/Stop" button failed to turn off the engine as the manufacturer had intended.

131.   Although all of the makes/models of automobiles listed in **Exhibit 1** have Keyless Fobs, upon information and belief (and based on counsel's review of the thousands of pages of over 1,500 pre-sale brochures), *none* have Auto-Off. As a result, in just the past five years, at least 14 people have died and many more have been seriously injured, requiring hospitalization due to carbon monoxide poisoning.

**C.     FCA Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through News Reports of Injuries and Deaths**

132.   A detailed investigation by counsel has uncovered news reports describing deaths and injuries from the Defect.[27]

133.   To date in 2015 alone, several people have died or have been seriously injured from carbon monoxide poisoning caused by the Defect:

(a)     On or about April 12, 2015, in Mooresville, North Carolina, several household members woke up vomiting and had to be hospitalized for carbon monoxide poisoning after a Keyless Fob-equipped Nissan Murano continued to run for over 10 hours in the garage. "[H]er vehicle does shut off after 15 minutes, but only if [it is started via a remote start system]. That's not the case, though, if she starts it with the start button.";[28]

(b)     On or about April 24, 2015, a man was found unconscious in his townhome from carbon monoxide poisoning caused by an Affected Vehicle. Fortunately, his neighbor discovered and rescued him and was able to prevent his

---

[27] For example, one article provides a chart of the documented deaths and injuries caused by the Defect. *See* Fleischer, *supra.*

[28] WBTV, *Keyless ignition cars linked to carbon monoxide poisoning,* www.wbtv.com (April 12, 2015), http://www.wbtv.com/story/28473481/keyless-ignition-cars-linked-to-co-poisoning (last visited Aug. 5, 2015).

1    untimely death. "The injured man was in serious condition when the fire

2    department took him to [the hospital].";[29]

3            (c)    Rina and Pasquale Fontanini returned to their home in their

4    2013 Lincoln MKS. The couple parked their car in the attached garage and either

5    inadvertently forgot to shut down the engine or pushed the Start/Stop button in an

6    effort to do so. The couple then entered their home, but unbeknownst to them the

7    car engine continued to run. Their house filled with deadly carbon monoxide and

8    both Rina and Pasquale were later found dead the next day by their son, a

9    lieutenant in the Highland Park Fire Department.[30] On August 20, 2015, the

10   executrix of the Fontanini's estate filed a wrongful death lawsuit against Ford

11   Motor Company, Lincoln Motor Company, and Libertyville Lincoln Sales, Inc.,

12   alleging strict liability arising out of the keyless ignition defect;[31]

13           (d)    On or about June 18, 2015, a Berkeley Heights, New Jersey

14   man died and his wife was left unconscious when their Affected Vehicle continued

15   to run after the driver exited the vehicle;[32]

16           (e)    On September 6, 2015, a Boynton Beach, Florida resident died

17   after her Affected Vehicle continued to run in the garage;[33]

18

19

20   _____

     [29] Sun-Sentinel, *Carbon monoxide detector saves lives in apartment complex,*
     Sun-Sentinel.com (April 24, 2015), http://www.sun-

21   sentinel.com/local/broward/fort-lauderdale/fl-lauderdale-carbon-monoxide-rescue-
     20150424-story.html (last visited Aug. 5, 2015).

22   [30] *Carbon Monoxide Death Prompts Questions About Keyless Auto Ignitions*,
     *supra*.

23   [31] *Manfredini v. Ford Motor Co. See also McCoppin, supra.*

24   [32] Suzanne Russell, *Carbon monoxide fumes kill Berkeley Heights man*, MY
     CENTRAL JERSEY(June 18, 2015),

25   http://www.mycentraljersey.com/story/news/local/union-
     county/2015/06/18/elderly-berkeley-heights-man-dies-apparent-exposure-co-

26   fumes/28925991/ (last visited Aug. 5, 2015).

     [33] Palm Beach Post, *Suburban Boynton carbon monoxide death prompts

27   awareness campaigns*, www.mypalmbeachpost.com (Sept. 30, 2015),
     http://www.mypalmbeachpost.com/news/news/local/suburban-boynton-carbon-

28   monoxide-death-prompts-awa/nnrZM/ (last visited Oct. 1, 2015).

_____

CLASS ACTION COMPLAINT                                                          30

1      (f)      On October 31, 2015, a mother, Constance Petot returned from

2   a long day at work to her parents' home in the Jacksonville, Florida area, and

3   parked her vehicle in the attached garage. She believed that she had pressed the

4   Start/Stop button in her vehicle to turn off the engine, she closed the garage door,

5   and she went into the house. In the middle of the night, her 13-month-old son woke

6   up screaming. Constance knew something was wrong when she started feeling

7   dizzy and her son went limp in her arms. After walking downstairs, Constance

8   discovered that the vehicle engine was still running. She and her son both received

9   emergency medical treatment, and she subsequently learned that the level of

10  carbon monoxide in the house was high enough to have killed both her and her son

11  if they had remained in the house for only twenty additional minutes;[34] and

12      (g)      On November 7, 2015, in Issaquah, Washington, firefighters

13  were summoned by a neighbor to a household of six, which included two

14  grandparents, two parents, and two children – one child under 10 years old and the

15  other a 17-month-old baby.[35] The father had come home from work and believed

16  he had pressed the Start/Stop button in his Toyota Sienna vehicle to turn off the

17  engine. The Toyota Sienna is an Affected Vehicle. Despite the fact that the

18  family's house had carbon monoxide detectors on every floor, none of the alarms

19  alerted the family to the danger.[36] As a result, all six family members plus three of

20  the first-responder firefighters suffered from carbon monoxide poisoning and

21  required hospitalization.[37] The neighbor's call could have been too late, though –

22  the Toyota Sienna minivan fortunately ran out of gas before it could emit enough

23  carbon monoxide to kill everyone in the household.[38] The 17-month-old baby was

24

25      [34] Fleischer, *supra.*

26      [35] Guerrero, *supra.*

27      [36] Kim, *supra.*

        [37] Garnick, *supra.*

28      [38] *Issaquah family poisoned by carbon monoxide is back home*, *supra.*

1   hospitalized and treated in a hyperbaric chamber with oxygen therapy for three

2   days.[39]

3       134.   More deaths and injuries were also reported between 2010 and 2014:

4           (a)   A woman was found dead in her townhome and her boyfriend

5   was found "clinging to life" when the woman's Lexus with a Keyless Fob

6   continued to run in the garage of the woman's home;[40]

7           (b)   On June 6, 2013, Bill and Eugenia Thomason returned to their

8   home in Greenville, South Carolina, and parked their 2005 Toyota Avalon,

9   equipped with a Keyless Fob, in the attached garage. After exiting the car, Mrs.

10  Thomason had no idea that the vehicle's engine was still running, particularly

11  because Toyota designed the vehicle to run quietly. The couple closed the garage

12  and entered their home, never realizing that the vehicle engine was emitting deadly

13  carbon monoxide into the home. The next day, the couple did not show up at

14  church, and their friends grew worried. The police were called to the house and

15  found the Thomasons "face-up", barely breathing in their bed. EMS was called,

16  and the couple was rushed to Greenville Memorial Hospital in an effort to save

17  their lives. Despite several days of treatment, Bill and Eugenia both suffered brain

18  injuries and ultimately died in the hospital;[41]

19

20

21

22

23

24      [39] *Issaquah family treated for carbon monoxide poisoning; Fumes entered the home*, *supra*.

25      [40] WMAR, *A warning about keyless ignitions*, www.abc2news.com (June 27, 2011), http://www.abc2news.com/news/local-news/investigations/a-warning-about-keyless-ignitions (last visited Aug. 5, 2015).

26      [41] The State, *Accident likely caused Greenville couple's deaths, police say*, www.thestate.com (June 19, 2013), http://www.thestate.com/news/local/article14434898.html (last visited Aug. 5, 2015).

27

28

1    (c)    A Weymouth, Massachusetts couple and their two

2 grandchildren all became ill and had to be hospitalized after their Keyless Fob-

3 equipped Lexus ES350 caused carbon monoxide poisoning;[42]

4    (d)    A couple from Manchester, Missouri died after their Keyless

5 Fob-equipped vehicle continued to run in their garage;[43]

6    (e)    A Lancaster Township, Pennsylvania couple died from carbon

7 monoxide poisoning after their Affected Vehicle continued to run in their garage;[44]

8    (f)    In Boca Raton, Florida, a 29-year-old woman died of carbon

9 monoxide poisoning caused by her Keyless Fob-equipped 2006 Lexus;[45] and

10    (g)    In Boca Raton, Florida, a couple died when their Keyless Fob-

11 equipped Mercedes-Benz continued to run.[46] Mort Victor and his girlfriend, Adele

12 Ridless, were found dead in their bed upstairs after the house filled with deadly

13 levels of carbon monoxide from their Affected Vehicle parked in their garage. The

14 couple had just returned from dinner at a nearby seafood restaurant and had packed

15 their bags for a flight the next day from Fort Lauderdale to San Francisco. The

16 couple's friends came to the door the next morning but, despite knocking on the

17

---

18 [42] WCVB, *Couple, kids hospitalized after car left running in Weymouth garage,* www.wcvb.com (April 22, 2014), http://www.wcvb.com/news/couple-kids-

19 hospitalized-after-car-left-running-in-weymouth-garage/25597062 (last visited Aug. 5, 2015).

20 [43] Betsey Bruce, *Elderly couple found dead in Manchester home,* FOX2now.com. (May 17, 2014), http://fox2now.com/2014/05/17/elderly-couple-

21 found-dead-in-manchester-home/ (last visited Aug. 5, 2015).

22 [44] Cindy Stauffer, *Forgetting to turn off your car: Carbon monoxide deaths happen in Lancaster County, and across the country,* Lancasteronline.com (May 7,

23 2014), http://lancasteronline.com/news/local/forgetting-to-turn-off-your-car-carbon-monoxide-deaths-happen/article_40e8f97e-d602-11e3-a66e-0017a43b2370.html (last visited Aug. 5, 2015).

24 [45] Sun-Sentinel, *Investigation into carbon monoxide death near Boca Raton includes keyless car,* (September 1, 2010), http://articles.sun-sentinel.com/2010-

25 09-01/news/fl-carbon-monoxide-keyless-20100831_1_carbon-monoxide-electronic-fob-auto-safety-experts (last visited Aug. 5, 2015).

26 [46] Sun-Sentinel, *Keyless Mercedes linked to carbon monoxide poisoning in West Boca, authorities say.* www.sun-sentinel.com (March 16, 2012), http://articles.sun-

27 sentinel.com/2012-03-16/news/fl-carbon-monoxide-cars-20120313_1_carbon-monoxide-keyless-ignition-keyless-systems (last visited Aug. 5, 2015).

28

door many times, no one answered. The police investigation revealed that the couple's Mercedes vehicle—equipped with a Keyless Fob—had been running in the garage overnight, filling the house with deadly fumes. In response to this publicized case, Mercedes commented that it "believe[s] Keyless Go to be a safe system."[47]

135.   While counsel uncovered the above-referenced news stories concerning the Defect during their pre-suit investigation, counsel believe that the number of deaths and injuries are likely far greater than reported because only some deaths are reported in the media, and even when deaths are reported, a cause of death is often not provided or known.

136.   Upon information and belief, FCA Group regularly reviews news stories that affect its public image, especially news stories about each of the Automaker's vehicular safety. Thus, FCA Group has (and had) actual knowledge of all of the above-referenced news stories concerning deaths and injuries that resulted from the lack of Auto-Off.

**D.   FCA Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Recalls**

137.   On Friday, March 13, 2015, Chevrolet, a GM Group vehicle brand, issued an official recall of all 2011, 2012 and 2013 model year Chevrolet Volt range-extended electric cars[48] to address an issue with the car's on-board software that allowed its gasoline engine to operate for extended periods of time while

---

[47] *Id.*

[48] Range extended electric vehicles are <u>not</u> pure electric vehicles. Rather, "range extenders," as they are known in the industry, rely primarily on the electric battery pack for shorter travel periods but rely on a separate conventional gasoline engine to continuously regenerate the battery pack when the battery depletes, or for more extended driving distances. In other words, range extended electric vehicles are the same as conventional gasoline automobiles when it comes to Plaintiffs' claims as stated herein. Range extended electric vehicles, just like conventional gasoline automobiles, have a gas combustion engine to recharge the battery, and they emit harmful levels of carbon monoxide without Auto-Off.

1  parked but unintentionally left powered on. According to official NHTSA recall

2  documents,[49] the GM Group itself estimated that "100%" of the 50,236 Chevrolet

3  Volts were plagued by this defect, noting the following:

> **Description of the Safety Risk:** If the gas engine runs for long periods of time within an enclosed space, such as a garage, carbon monoxide could build up in the enclosed space and potentially cause injury.
>
> **Description of the Cause:** The 2011-2013 MY Volt vehicles were not equipped with software that automatically shuts off a vehicle after a predetermined amount of time. This software was deployed starting with the 2014 MY [Model Year] Volt vehicles and beyond.

10  The recall itself was not a prolonged, difficult process. To the contrary, vehicle

11  dealers simply had to reprogram the cars via a software update taking just 30

12  minutes per vehicle. Dealers were reimbursed $4.78 per vehicle for the

13  reprogramming.[50]

14      138.    The GM Group admitted in its recall of the 2011-2013 Chevrolet

15  Volts that: 1) Keyless Fobs pose a safety risk because "carbon monoxide could

16  build up in [an] enclosed space,"[51] and 2) the vehicles could be modified to cure

17  the Defect with a simple software update costing less than $5.00 per vehicle and

18  taking just 30 minutes of dealership time per vehicle.

19      139.    Despite the fact that the GM Group implemented this remedy for the

20  2011-2013 Chevrolet Volts, it has failed to do so for *any* of its other Affected

21  Vehicles that have the *exact same* Defect.

22

23  [49] NHTSA Safety Recall 14617: *Defect Notice report*, www.nhtsa.dot.gov,

24  http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM474874/RCLRPT-15V145-6748.PDF.

25  [50] NHTSA Safety Recall 14617: *Remedy Instructions and TSB*, www.nhtsa.dot.gov, http://www-

26  odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM476093/RCRIT-15V145-6506.pdf.

27  [51] NHTSA Safety Recall 14617: *Defect Notice report*, www.nhtsa.dot.gov,

28  http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM474874/RCLRPT-15V145-6748.PDF.

140.   Upon information and belief, FCA Group regularly reviews recalls, including the above-referenced recall, by competitor Automakers, and it too has (and had) actual knowledge of the Defect that exists in the absence of Auto-Off.

**E.   FCA Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Automaker Patent Applications**

141.   Both the GM Group and the Ford Group have patented or have sought to patent the very Auto-Off systems that would prevent the Defect.

142.   On May 20, 2013, the GM Group filed for a patent (issued on March 17, 2015, under patent number 8,983,720) to address the Defect.[52] GM's patent, which was granted, explicitly addressed the concerns (and relief requested) that Plaintiffs and the Class seek here. Specifically, the patent seeks to avoid the situation wherein the "engine may have been errantly left running, in which case the vehicle sends a notice to the user[, and i]f no response [from the user] is received [then] the vehicle can activate the engine kill device and stop the engine."[53] The patent acknowledges that a "vehicle operator may unintentionally leave a motor vehicle engine running … [which can] contribute to an accumulation of exhaust gas if not properly ventilated, such as in some garages." Moreover, the patent includes "one or more carbon monoxide (CO) sensors" so that the vehicle can "indicate [if] exhaust fumes are present at dangerous levels."[54] The GM Group has (and had) actual knowledge of the inherent dangers of not including Auto-Off (and the Defect that would otherwise result) well in advance of its May 20, 2013, patent application filing.

143.   Similarly, on November 1, 2011, the Ford Group filed for a patent, application number 2013/0110374, to address the Defect.[55] The patent application

---

[52] *See* **Exhibit 7**.
[53] *Id.*
[54] *Id.*
[55] *See* **Exhibit 8**.

explicitly addresses the concerns (and relief requested) that Plaintiffs and the Class seek here. Specifically, the patent application seeks to avoid the situation wherein "a vehicle operator may unintentionally leave the vehicle with the engine idling," which is common because "engine technology that have made vehicle engines quieter further increase the likelihood that a vehicle operator may leave the vehicle with the engine running."[56] Thus, Ford's patent application proposes a method whereby the "vehicle control systems may be configured to automatically shut down an idling engine, for example, upon the elapse of a specified duration of idling time."[57] Moreover, the patent application specifically anticipates a situation in which the vehicle is left "in a substantially enclosed space, such as an indoor garage, [then] the vehicle control system may automatically shut down the idling engine in anticipation of the operator not returning to the vehicle imminently."[58] Thus, the Ford Group has (and had) actual knowledge of the inherent dangers of not including Auto-Off (and the Defect that would otherwise result) well in advance of its November 1, 2011, patent application filing.

144.   Upon information and belief, FCA Group regularly reviews patents by competitor Automakers, and thus it had actual knowledge of the Defect that exists in the absence of Auto-Off as a result of the GM and Ford Group patents.

**F.    FCA Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Third-Party Patent Applications**

145.   Upon information and belief, FCA Group regularly reviews patents pertaining to the automotive industry and safety. There are, at a minimum, four issued or pending patents for Auto-Off systems or mechanisms dating back to November 16, 2007, in addition to the applications submitted by the Ford Group and the GM Group discussed above.

---

[56] *Id.*
[57] *Id.*
[58] *Id.*

(a)     Patent number 7,650,864, applied for on November 16, 2007, by Magna Electronics Inc. and issued on January 26, 2010, concerns remote starting systems on cars and a built-in Auto-Off system to prevent the Defect. Magna Electronics described its proposed technology in the patent: "Since vehicles typically exhaust carbon monoxide and carbon dioxide emissions during operation of the engine, and since such emission buildup in an enclosed environment can be dangerous, the remote starter control module preferably provides one or more safety measures or features to reduce or mitigate any potential CO/CO2 buildup in situations where the vehicle may be parked in an enclosed environment."[59]

(b)     Patent application number 2012/0130604, filed on November 21, 2011, by Michael W. Kirshon, *et al.*, calls for "a series of sensors installed within a vehicle to monitor functions to determine if a vehicle engine is running and there is a potential for toxic exhaust gases to accumulate, creating a toxic environment."[60] In other words, this patent describes an Auto-Off system to prevent the Defect. Patent application number 2012/0130604 describes the Defect associated with the Affected Vehicles as follows:

> Combustion engines discharge an exhaust that includes toxic gases, such as carbon monoxide. It is well known that elevated levels of carbon monoxide gases contained within a closed space can have harmful and even fatal effects on individuals exposed to higher concentrations thereof.
>
> Numerous occurrences have been noted where residential occupants have succumbed to toxic exhaust gases discharged by a running vehicle engine, where the vehicle was parked within an attached garage. Several advancements in vehicle technology are aggravating the potential issue. For example, keyless engine control systems allow an operator to leave the vehicle while the engine remains running. Until recently, all vehicle engines would initiate operation by inserting a key into an ignition switch, whereby removing the key causes the

[59] *See* **Exhibit 9.**
[60] *See* **Exhibit 10.**

engine to cease operating. The vehicle key would commonly be stored on a key ring used to hold a series of keys. The operator commonly uses other keys to access buildings, offices, desks, residence, etc. An operator who forgets to remove the keys from the vehicle would be reminded the next time a key stored on the same key ring would be needed. Furthermore, vehicle engines are now much quieter, making people less aware that the engine is running. In addition, vehicles now commonly include remote starters, where an individual can start a vehicle's engine remotely. This can occur by accidentally depressing the remote start button, thereby starting the vehicle engine unbeknownst to the individual.[61]

Patent application 2012/0130604 thus proposes to patent a system whereby a series of sensors "automatically disables or turns off the ignition of the vehicle engine to cease the generation of the toxic exhaust gases."[62]

(c)     Patent number 8,825,224, applied for on March 26, 2012, by Directed, LLC and issued on September 2, 2014, concerns "[a]n automated vehicle shutdown and user notification method and device for shutting down an engine in a vehicle having a passive keyless entry and start ignition system where the engine has unintentionally been left running by the user is disclosed."[63] In the relevant part, patent number 8,825,224 describes the Defect associated with the Affected Vehicles as follows: "Long term idling of the engine within a confined space, such as within a garage attached to a dwelling, can lead to a rise in carbon monoxide levels that might potentially cause asphyxiation, brain damage or death to individuals exposed to high concentrations of carbon monoxide inside the dwelling."[64]

(d)     Patent number 8,977,476, applied for on August 14, 2012, by Safety Shutdown, LLC and issued on March 10, 2015, concerns "[a] system for

---

[61] *Id.*
[62] *Id.*
[63] *See* **Exhibit 11.**
[64] *Id.*

1   automatically shutting down an engine of a motor vehicle" taking into account

2   multiple variables, including an Auto-Off timer, carbon monoxide sensing ability,

3   and a driver's potential override request.[65] The background section of Safety

4   Shutdown, LLC's patent duplicated in full Michael W. Kirshon, *et al.*'s patent

5   application number 2012/0130604 regarding why such a safety mechanism is

6   paramount, i.e., that engine idling can cause deadly levels of carbon monoxide can

7   spread to the dwelling and cause serious injury and death. In short, Safety

8   Shutdown, LLC's patent covers the exact Defect as described herein.

9       146.   Upon information and belief, FCA Group reviews patents that may

10   have an effect on the technology in the Affected Vehicles, and thus it too had

11   actual knowledge of the Defect that exists in the absence of Auto-Off as a result of

12   these third-party patents.

13   **G.   FCA Group has (and had) Actual Knowledge of the Dangerous Carbon**

14        **Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Personal Injury Lawsuit Filings**

15       147.   Some of the Automakers have faced personal injury and wrongful

16   death lawsuits as a result of the Defect, but instead of instituting Auto-Off in the

17   Affected Vehicles, these Automakers have quietly settled the suits behind

18   confidentiality agreements, thereby concealing the risks of the Defect. On

19   November 1, 2010, Myrna and Donato Pastore filed a wrongful death lawsuit

20   against Toyota for the death of Ernest Codelia, Jr.[66] The Amended Complaint

21   states that Mr. Codelia died of carbon monoxide poisoning caused by his 2008

22   Lexus EX 350, which was equipped with a Keyless Fob.[67] Toyota insisted that the

---

[65] *See* **Exhibit 12.**

[66] *Socorro v. Toyota Motor N. Am., Inc.*, No. 1:10-cv-05020, ECF No. 1 (E.D.N.Y. Nov. 1, 2010).

[67] *Id.* at ECF No. 11.

settlement be under seal, and thus there are no publicly available documents or information as a result of this suit.[68]

148.   In a related suit, filed by Mary Rivera on October 29, 2010, against Toyota, she alleges that she collapsed and was found barely breathing as a result of carbon monoxide poisoning caused by her 2008 Lexus EX 350, which was equipped with a Keyless Fob and continued to run after the driver left the vehicle.[69] Ms. Rivera is a former college professor who now suffers from permanent brain damage as a result of the carbon monoxide poisoning. Though Ms. Rivera survived the incident, her partner Ernest Cordelia, Jr., died—as noted in the paragraph immediately above—with 65 percent carbon monoxide poisoning in his blood, according to an autopsy report. This case was settled and closed on October 1, 2014; the settlement was also finalized under seal.[70]

149.   On April 1, 2011, Linda Bloom and Rachelle Brown filed a wrongful death action against Toyota for the death of their father, Meyer Michael Yaffe, who died on December 30, 2010, as a result of carbon monoxide poisoning from his 2009 Lexus EX 350, which was equipped with a Keyless Fob.[71]

150.   On June 14, 2011, Kimberlin Nickles filed a wrongful death action against Toyota for the death of her 29-year-old daughter, Chastity Glisson, who died on August 26, 2010, as a result of carbon monoxide poisoning from her 2006 Lexus IS 250, an Affected Vehicle.[72] Chastity Glisson parked her Lexus in the garage. Later that night, she collapsed in the third-floor bathroom. Her boyfriend, Timothy Maddock, discovered her body and tried to help her, but then he too

---

[68] *See id.*, at ECF Nos. 53, 54 (joint letter stating that Toyota insisted on full confidentiality, even though safety concerns were at issue).

[69] *Rivera v. Toyota Motor*, ECF No. 13.

[70] *Id.* at ECF Nos. 64 and 65.

[71] *Bloom v. Toyota Motor N. Am., Inc.*, No. BC458715 (Cal. Sup. Ct., Cty. of Los Angeles 2011).

[72] *Nickles v. Gables Constr.*

1    succumbed to the carbon monoxide that had by then filled the house and lost

2    consciousness. Tragically, neither Ms. Glisson nor Mr. Maddock was found until

3    the next day. By then, 29-year-old Chastity Glisson had died, and Timothy

4    Maddock was critically injured and required hospitalization for ten days. An

5    investigation revealed that the carbon monoxide that killed Ms. Glisson and

6    severely injured Mr. Maddock came from the Lexus in the garage, which was

7    equipped with a Keyless Fob and, unbeknownst to the occupants of the home,

8    continued to run after the driver exited the vehicle.[73]

9        151.   On December 30, 2014, William Thomason, Jr. filed a wrongful death

10   action against Toyota for the death of relatives, Bill and Eugenia Thomason.[74] On

11   June 6, 2013, Bill and Eugenia Thomason returned to their home in Greenville,

12   South Carolina, and parked their 2005 Toyota Avalon, equipped with a Keyless

13   Fob, in the attached garage. After exiting the car, Mrs. Thomason had no idea that

14   the vehicle's engine was still running, particularly because Toyota designed the

15   vehicle to run quietly. The couple closed the garage and entered their home, never

16   realizing that the vehicle engine was emitting deadly carbon monoxide into the

17   home. The next day, the couple did not show up at church, and their friends grew

18   worried. The police were called to the house and found the Thomasons "face-up",

19   barely breathing in their bed. EMS was called, and the couple was rushed to

20   Greenville Memorial Hospital in an effort to save their lives. Despite several days

21   of treatment, Bill and Eugenia both suffered brain injuries and ultimately died in

22   the hospital.

23       152.   On August 20, 2015, the family of Rina and Pasquale Fontanini filed a

24   wrongful death action against Ford.[75] On June 14, 2015, Rina and Pasquale

---

26   [73] *Id.*

27   [74] *Thomason v. Toyota Motor Eng'g & Mfg. N. Am. Inc.*, No. 6:14-cv-04895 (D.S.C. 2014).

28   [75] *Manfredini v. Ford Motor Co.*

1   Fontanini returned to their home in their 2013 Lincoln MKS. The couple parked
2   their car in the attached garage and either inadvertently forgot to shut down the
3   engine or pushed the Start/Stop button in an effort to do so. The couple then
4   entered their home, but unbeknownst to them the car engine continued to run.
5   Their house filled with deadly carbon monoxide and both Rina and Pasquale were
6   later found dead the next day by their son, a lieutenant in the Highland Park Fire
7   Department.[76] On August 20, 2015, the executrix of the Fontanini's estate filed a
8   wrongful death lawsuit against Ford Motor Company, Lincoln Motor Company,
9   and Libertyville Lincoln Sales, Inc., alleging strict liability arising out of the
10  keyless ignition defect.

11          153.   Upon information and belief, FCA Group regularly reviews lawsuits
12  filed against itself and against competitor Automakers pertaining to automotive
13  safety. Thus, FCA Group was aware not only of suits in which it was named as a
14  defendant, if any, but also of suits concerning death or injury caused by the Defect
15  filed against other Automakers.

16  **H.    FCA Group has (and had) Actual Knowledge of the Dangerous Carbon
        Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that
17      lack Auto-Off through Information in the NHTSA Complaint Database**

18          154.   FCA Group readily has access to all NHTSA complaints pertaining to
19  both its own manufactured vehicles as well as any other Automakers' automobiles.
20  Upon information and belief, FCA Group regularly reviews NHTSA complaints
21  pertaining to both itself, as well as its competitor Automakers, to ensure internal
22  quality and safety compliance. There have been, at a minimum, 35 formally-filed
23  NHTSA complaints about the Defect. Attached as **Exhibit 2** is a list of 35
24  complaints lodged with the NHTSA by consumers about Defect incidents
25  associated with Keyless Fobs. For example, and as listed in chronological order:

26

27          [76] *Carbon Monoxide Death Prompts Questions About Keyless Auto Ignitions*,
28  *supra*.

(a)     On April 6, 2009, a person with a Toyota Group vehicle, a 2008 Lexus LS460, filed NHTSA complaint number 10264229, stating:

> COMPLAINT REGARDING DANGER OF DEATH DUE TO CARBON MONOXIDE. THIS CAR IS KEYLESS WHICH OFTEN RESULTS IN THE FAILURE OF THEIR DRIVER SHUTTING OFF THE ENGINE WHICH IS AT TIMES PARKED INSIDE AN ENCLOSED GARAGE OF A HOME. THIS OCCURRED ON THREE DIFFERENT OCCASIONS AT MY HOME. THANK GOD I HAD A CARBON MONOXIDE ALARM IN MY HOME WHICH ALERTED ME OF THIS PROBLEM. LEXUS SHOULD HAVE INSTALLED SOME SORT OF SWITCH WHICH WOULD AUTOMATICALLY SHUT OFF THE ENGINE WHEN THE DRIVER SEAT HAS BEEN UNOCCUPIED FOR FIFTEEN MINUTES. **LEXUS STATES THEY HAVE RECEIVED MANY COMPLAINTS THROUGHOUT THE COUNTRY, HOWEVER THERE IS NOTHING THEY CAN DO ABOUT THIS PROBLEM AND DANGER. EXISTING CARS SHOULD BE RECALLED AND REPAIRED AND THIS SHOULD BE MANDATORY FOR ALL FUTURE CARS WITH A KEYLESS SYSTEM.**[77]

(b)     On May 4, 2009, a person with a Nissan Group vehicle, a 2009 Nissan Murano S, filed NHTSA complaint number 10267647, stating:

> [MY CAR] COMES WITH PUSH BUTTON "START/STOP" ENGINE […] THE DANGER IS WHEN YOU PARK THE CAR IN YOUR GARAGE...AND FORGET TO PUSH THE START/STOP BUTTON TO TURN THE ENGINE OFF... BECAUSE THIS TECHNOLOGY IS NEW, THE INSTINCT IS TO PULL THE KEY FOB OUT AND GET OUT OF THE CAR... THE ENGINE REMAINS ON AND IT IS QUIET ENOUGH THAT YOU DO NOT NOTICE THE ENGINE RUNNING... THE DANGER IS THAT CARBON MONOXIDE CAN FILL UP YOUR GARAGE AND HOUSE AND KILL THE INHABITANTS... I CONTACTED NISSAN VIA EMAIL. THEY HAD A TECH. REVIEW MY COMPLAINT AND RESPONDED AS FOLLOWS "DON'T FORGET TO PUSH THE BUTTON TO TURN

---

[77] **Exhibit 2** at 25 (emphasis added).

THE ENGINE OFF"... **OBVIOUSLY [NISSAN] DO[ES] NOT GET THE DANGER**.[78]

    (c)    On February 3, 2010, a person with a Nissan Group vehicle, a Nissan Altima, filed NHTSA complaint number 10304356, stating:

> [I] WOULD LIKE TO BRING TO YOUR ATTENTION A DEFECT THAT I BELIEVE NEEDS TO BE CORRECTED IN AT LEAST SOME, IF NOT ALL, OF NISSAN, LATEST ALTIMA VEHICLES. THE PROBLEM OCCURS WHEN THE CAR IS LEFT RUNNING AND THE VEHICLE DOORS ARE CLOSED WITH THE REMOTE "KEYLESS". THIS PROBLEM COULD CREATE A SERIOUS SAFETY & HEALTH ISSUE IF A DRIVER FORGETS TO SHUT OFF THE ENGINE BEFORE USING THE REMOTE KEY TO CLOSE THE VEHICLE DOORS.[79]

    (d)    On February 9, 2010, a person with a Toyota Group vehicle, a 2009 Toyota Camry Hybrid, filed NHTSA complaint number 10308004, stating:

> SAFETY HAZARD!. 2009 TOYOTA CAMRY (LIKELY ALL HYBRID AUTOMOBILES) WILL CONTINUOUSLY RESTART THE GAS ENGINE TO RECHARGE THE BATTERY IF THE IGNITION SYSTEM IS NOT TURNED OFF WHEN DEPARTING THE VEHICLE. IF THE AUTO IS IN AN ATTACHED GARAGE THIS COULD RESULT IN ACCIDENTAL CO POISONING TO OCCUPANTS WITHIN THE DWELLING. I HAVE OBSERVED A HYBRID CONTINUOUSLY RESTARTING WHILE PARKED IN THE DRIVEWAY. THIS CAR IS USUALLY KEPT IN AN ATTACHED GARAGE. THE OWNER FORGOT TO TURN OFF THE IGNITION UPON LEAVING THE CAR. THIS IS LIKELY A COMMON EVENT. THIS WILL EVENTUALLY RESULT IN SERIOUSLY INJURY OR DEATH, AND MAY HAVE ALREADY HAPPENED AND NOT BEEN PROPERLY IDENTIFIED AND REPORTED.[80]

    (e)    On April 28, 2010, a person with a Toyota Group vehicle, a 2007 Lexus LS460, filed NHTSA complaint number 10326861, stating:

---

[78] *Id.* at 26 (emphasis added).
[79] *Id.* at 24.
[80] *Id.* at 5.

I ARRIVED HOME AFTER DINNER […] CLOSED THE GARAGE DOOR AND, LEAVING THE KEY FOB INSIDE THE VEHICLE, I ENTERED MY HOME AND EVENTUALLY WENT TO SLEEP. I WAS AWOKEN AT APPROX. 2:15AM BY A CARBON MONOXIDE ALARM LOCATED IN THE FOYER INSIDE MY HOME ADJACENT TO THE ENTRANCE TO THE GARAGE. I ENTERED THE GARAGE TO DISCOVER THAT THE CAR'S ENGINE WAS STILL RUNNING, THE GARAGE FILLED WITH NOXIOUS FUMES, AND THE ENTIRE VEHICLE EXTREMELY HOT TO TOUCH, INSIDE AND OUT. I OPENED THE GARAGE DOOR AND WAS EVENTUALLY ABLE TO SHUT DOWN THE ENGINE AND CLEAR OUT THE FUMES. AS I SEE IT, THE FAILURE HERE WAS TWO-FOLD: (1) WHEN I OPENED MY DOOR TO EXIT THE CAR, NO ALARM OR OTHER SOUND ALERTED ME THAT THE ENGINE WAS STILL RUNNING, AS IS THE CASE WITH IGNITIONS REQUIRING KEYS. THIS IS PARTICULARLY PROBLEMATIC BECAUSE THE **CAR'S ENGINE RUNS IN VIRTUAL SILENCE**; AND (2) EVEN AFTER THE CAR WAS UNWITTINGLY LEFT IDLING WHILE IN PARK, **THE ENGINE DID NOT CUT OFF AFTER SOME PREDETERMINED PERIOD OF TIME**. I SPOKE TO MY LOCAL LEXUS DEALER, WHO SUGGESTED THAT I CONTACT LEXUS USA DIRECTLY. […] **AFTER BEING TOLD BY LEXUS THAT THEY SEE NO PROBLEMS WITH THEIR KEYLESS IGNITION SYSTEM, I ELECTED TO TAKE ANOTHER APPROACH AND CONTACT NHTSA. […] LEXUS HAS TAKEN NO RESPONSIBILITY FOR THIS INCIDENT WHICH NEARLY KILLED ME AND WHICH COULD KILL OTHERS, AND OFFERS NO SOLUTIONS OR FIXES TO THIS PROBLEM**.[81]

(f)      On May 28, 2010, a person with a Toyota Group vehicle, a 2009 Toyota Highlander Hybrid, filed NHTSA complaint number 10332639, stating:

OUR GARAGE IS ATTACHED TO OUR HOUSE WITH OUR BEDROOM ABOVE THE GARAGE. WITH 3 KIDS, BOTH MY WIFE AND I HAVE BEEN DISTRACTED LEAVING THE CAR IN THE GARAGE TO UNLOAD GROCERIES OR HELP THE CHILDREN. WHEN ON ELECTRIC POWER WE

---

[81] *Id.* at 23 (emphasis added).

HAVE NEGLECTED TO TURN OFF THE IGNITION SINCE THE [HYBRID] CAR IS SILENT [WHILE PARKED]. ONLY WHEN THE CARBON-MONOXIDE DETECTOR SOUNDED IN OUR GARAGE DID WE REALIZE THE ENGINE HAD STARTED WHILE WE WERE IN THE HOUSE. WE THINK THIS COULD BE DEADLY TO OTHER FAMILIES WITHOUT CARBON MONOXIDE ALARMS WHO MAY ALSO FORGET TO TURN OFF THE ENGINE WHEN PARKED IN AN ATTACHED GARAGE WHILE ON ELECTRIC POWER.[82]

(g)     One death was associated with a Toyota Group vehicle, described in NHTSA complaint number 10375730, filed on January 5, 2011:

ON THE EVENING OF DECEMBER 13, 2010, VICTIM LEFT HIS CAR RUNNING IN HIS GARAGE. THE CAR HAS A "SMART KEY" WHICH IS A REMOTE KEY-FOB. THIS MEANS THAT HE DOES NOT HAVE TO TURN A KEY TO TURN THE IGNITION ON AND OFF. INSTEAD, THE CAR TURNS ON AND OFF BY PRESSING THE SAME BUTTON ON THE DASH BOARD. HE MUST HAVE FORGOTTEN TO TURN THE CAR OFF. HE THEN WENT TO SLEEP AND SUFFERED CARBON MONOXIDE POISONING DURING THE NIGHT. HE WAS FOUND UNCONSCIOUS ON THE FLOOR THE NEXT MORNING. THE CAR WAS STILL RUNNING. THE VICTIM WAS TAKEN TO THE HOSPITAL, WHERE HE IS IN THE ICU AND SEDATED.[83]

(h)     One injury and one death associated with a Toyota Group vehicle, a 2006 Lexus IS 250, were described in NHTSA complaint number 10380153, filed on February 3, 2011:

A YOUNG LADY PARKED HER 2006 IS 250 LEXUS, EQUIPPED WITH A "SMART KEY" SYSTEM, IN HER ATTACHED GARAGE WHICH WAS ON THE GROUND FLOOR OF HER THREE STORY TOWNHOUSE. SHE EXITED THE VEHICLE WITH THE "KEY FOB" ON HER PERSON, BUT EITHER INADVERTENTLY FORGOT TO SHUT DOWN THE ENGINE OR PUSHED THE START BUTTON IN AN EFFORT TO DO SO BUT WAS UNSUCCESSFUL. THE YOUNG LADY DID NOT REALIZE THE

[82] *Id.* at 22 (emphasis added).
[83] *Id.* at 21.

VEHICLE WAS RUNNING AND AFTER ENTERING HER TOWNHOUSE FROM THE GARAGE PLACED THE "KEY FOB" ON A TABLE ON THE SECOND FLOOR. THE YOUNG LADY REMAINED IN HER TOWNHOUSE WITH THE VEHICLE RUNNING IN THE GARAGE UNTIL IT RAN OUT OF GASOLINE AND STOPPED. THE YOUNG LADY WAS SUBSEQUENTLY FOUND DEAD IN HER BATHROOM ON THE THIRD FLOOR. THE DEATH WAS DETERMINED TO HAVE BEEN CAUSED BY CARBON MONOXIDE POISONING AS A RESULT OF THE VEHICLE HAVING BEEN LEFT RUNNING IN THE GARAGE. THE VEHICLE LACKED A "SHUT-DOWN" SWITCH TO SHUT THE ENGINE OFF WHEN UNOCCUPIED AND INERT FOR AN INTERVAL OF TIME AND/OR LACKED AN ADEQUATE AURAL WARNING THAT THE "KEY FOB" WAS BEING REMOVED FROM THE VEHICLE WHILE IT WAS RUNNING OR THE OPERATOR HAD EXITED THE VEHICLE WHILE THE ENGINE WAS RUNNING.[84]

(i)      Two injuries were associated with a person with a Toyota Group vehicle, a 2011 Toyota Camry XLE, described in NHTSA complaint number 10394590, filed on March 20, 2011:

MY WIFE AND I ARE RETIRED IN FLORIDA. WE PARKED OUR 2011 TOYOTA CAMRY XLE WITH KEYLESS IGNITION IN OUR GARAGE AND BROUGHT THE KEY FOB WITH US INTO OUR HOME. MY WIFE EITHER DID NOT PUSH THE ENGINE OFF BUTTON HARD ENOUGH OR FORGOT TO PUSH THE ENGINE OFF BUTTON TO TURN OFF THE ENGINE. WE DID NOT HEAR THE 3 SHORT BEEPS TELLING US THE ENGINE WAS RUNNING AND THE KEY FOB WAS REMOVED FROM THE VEHICLE. THE GARAGE IS ATTACHED TO OUR HOME. THE VEHICLE WAS LEFT RUNNING IN OUR CLOSED GARAGE. CARBON MONOXIDE FUMES ENTERED OUR HOME CAUSING HEADACHES, NAUSEA, AND LETHARGY. OUR HOME CARBON MONOXIDE DETECTOR SOUNDED AN ALARM. WE INVESTIGATED AND FOUND THAT WE LEFT THE VEHICLE RUNNING IN THE GARAGE FOR 90 MINUTES. THE GARAGE TEMPERATURE WAS OVER 100(F) DEGREES. [...] WE WERE SICKENED

_____

[84] *Id.* at 20.

BY THE CARBON MONOXIDE FUMES AND CAME CLOSE TO LOSING OUR LIVES. THE KEYLESS IGNITION OPTION IS TOO DANGEROUS. **THERE NEEDS TO BE A CHANGE IN DESIGN THAT TURNS OFF THE ENGINE WHEN THE KEY FOB LEAVES THE VEHICLE AND THE ENGINE OFF BUTTON IS NOT DEPRESSED**.[85]

(j)    On June 10, 2011, a person with a GM Group vehicle, a 2011 Cadillac SRX, filed NHTSA complaint number 10405921, stating:

ON THE 2011 CADILLAC SRX THERE IS NO WARNING SOUNDED IF YOU LEAVE YOUR KEYLESS IGNITION RUNNING AND LEAVE THE VEHICLE. YESTERDAY, I INADVERTENTLY LEFT THE VEHICLE RUNNING AND **THE CAR DID NOT BEEP OR GIVE ME ANY INDICATION THAT I HAD DONE SO**. THESE KEYLESS IGNION SYSTEMS ARE VERY DANGEROUS BECAUSE IF YOU ACCIDENTALLY LEAVE THE CAR RUNNING IN THE GARAGE YOU COULD INADVERTENTLY CAUSE A CARBON MONOXIDE POISONING SITUATION. IT IS A VERY UNSAFE FEATURE THAT COULD BE CORRECTED WITH A SIMPLE WARNING SIGNAL. THERE NEEDS TO BE SOME TYPE OF WARNING, A CAR HORN BEEP OR SOMETHING TO LET THE DRIVER KNOW THAT THE VEHICLE IS RUNNING WHEN THE DRIVER LEAVES THE VEHICLE.[86]

(k)    On November 29, 2011, a person with a Toyota Group vehicle, a 2010 LEXUS RX 450h, filed NHTSA complaint number 10437757, stating:

HYBRID VEHICLE + KELSEY [sic, KEYLESS] IGNITION = DEADLY COMBINATION. WE ACCIDENTALLY LEFT OUR 2010 LEXUS RX 450H IN THE GARAGE WITH THE IGNITION "ON" AND TURNED IN FOR THE NIGHT. **SINCE IT IS A HYBRID, IT MAKES NO SOUND - EVEN WHEN "RUNNING".** SO WE WERE UNAWARE THE IGNITION WAS STILL ON. MUCH LATER IN THE EVENING, AFTER THE BATTERY HAD DEPLETED, THE GAS ENGINE CAME ON, FILLING OUR GARAGE WITH CARBON MONOXIDE. HAD I NOT GONE BACK OUT TO RETRIEVE SOMETHING FROM THE GARAGE AND NOTICED THAT BY

---

[85] *Id.* at 19 (emphasis added).
[86] *Id.* at 18 (emphasis added).

THIS TIME THE CAR'S GAS ENGINE WAS RUNNING, I LIKELY WOULDN'T BE WRITING THIS E-MAIL. THIS IS A VERY DANGEROUS FLAW IN AN OTHERWISE GREAT CAR. THE TINY RED VS. GREEN LED ON THE IGNITION BUTTON IS NOT ENOUGH INDICATION THAT THE CAR IS RUNNING. AN AUDIBLE ALARM OR SOME TYPE OF POSITIVE INTERLOCK IS NEEDED.[87]

(l)      On August 17, 2012, a person with a GM Group vehicle, a Chevrolet Volt, filed NHTSA complaint number 10471278, stating:

THERE IS AN APPARENT DESIGN FLAW IN THE CHEVY VOLT RELATED TO AN INDIVIDUAL EXITING THE VEHICLE WITHOUT POWERING DOWN THE SYSTEMS WHICH COULD RESULT IN CO POISONING OR DEATH AND POSSIBLE FIRE HAZARDS IN THE RIGHT SITUATION. THE VOLT USES A KEY FOB SYSTEM AND PUSH BUTTON START. KEY FOBS ARE ALREADY PROVING TO BE A SAFETY ISSUE. WITH THE VOLT, THE SITUATION IS EXACERBATED. SINCE THE CAR IS VIRTUALLY SILENT, IT IS VERY EASY FOR A PERSON TO FORGET TO TURN OFF THE CAR, AND WHEN THEY EXIT, **THE LACK OF ANY ENGINE NOISE** WILL OFTEN NOT GIVE THEM THE CUES NECESSARY TO REALIZE THEIR MISTAKE. WHEN THE INDIVIDUAL LEAVES THE CAR POWERED ON, THE BATTERY WILL DRAIN. WHEN THE BATTERY IS SUFFICIENTLY DRAINED, AN ENGINE WILL TURN ON AND CHARGE THE BATTERIES. THIS IS SIGNIFICANT, BECAUSE THIS WILL LIKELY HAPPEN SOMETIME AFTER A PERSON HAS PARKED THEIR CAR. THE RESULT WILL BE A GARAGE FILLING WITH CO FUMES. THE VOLT WILL CONTINUE TO RUN THE ENGINE, IN CYCLES, UNTIL THERE IS NO MORE GAS IN THE TANK. WHILE THERE HAVE ALREADY BEEN DEATHS ASSOCIATED WITH NON-ELECTRIC VEHICLES EQUIPPED WITH KEY FOBS AND CO POISONING AS THE RESULT OF THE DRIVER FORGETTING TO TURN THE CAR, THIS IS GOING TO BE MUCH MORE COMMON IN ELECTRIC HYBRID VEHICLES. **IN AN UNSCIENTIFIC POLL CONDUCTED ON GM-VOLT.COM, OF 100 RESPONDENTS, 30% ADMITTED TO**

---

[87] *Id.* at 17 (emphasis added).

**FORGETTING TO TURN THEIR VEHICLE OFF**. ONE USER ON THE SITE FORGOT TO TURN THE VEHICLE OFF, AND ENTERED THE GARAGE SOMETIME LATER TO FIND IT FILLED WITH FUMES. THERE NEEDS TO BE PASSIVE (HORN SIGNALS UPON EXIT) OR ACTIVE (WELL ENGINEERED AUTO SHUTOFF) SYSTEMS PUT IN PLACE TO PREVENT A TRAGEDY.[88]

(m)     One injury was reported associated with a person with a Toyota Group vehicle, a 2011 Lexus ES350, described in NHTSA complaint number 10458009, filed on May 10, 2012:

CONTACT OWNS A …2011 LEXUS ES350. THE CONTACT STATED THAT THE DRIVER EXITED THE VEHICLE AND FORGOT TO SHUT THE IGNITION OFF. THE VEHICLE WAS EQUIPPED WITH A PUSH TO START AND STOP FEATURE. THE ENGINE CONTINUED TO RUN UNTIL A CARBON MONOXIDE DETECTOR SOUNDED. THE DRIVER SUFFERED CARBON MONOXIDE POISONING AND AS A RESULT, WAS TAKEN TO A HOSPITAL TO TREAT THE CONDITION.[89]

(n)     One death was reported associated with a person with a Toyota Group vehicle, a 2006 Toyota Avalon, described in NHTSA complaint number 10497402, filed on February 11, 2013:

CONSUMER STATED HER PARENTS PURCHASED A NEW VEHICLE BACK IN 2006. THE VEHICLE CAME EQUIPPED WITH A KEYLESS REMOTE STARTING SYSTEM. ALL IT TOOK, WAS TO HAVE THE DEVICE IN ONES POCKET AND HER FATHER COULD GET IN THE VEHICLE, PRESS A BUTTON AND THE VEHICLE WOULD START UP. WHEN HER FATHER ARRIVED AT HIS DESTINATION, ALL HE HAD TO DO WAS, PUT THE VEHICLE IN PARK, PRESS THE REMOTE BUTTON AND THE ENGINE WOULD SHUT OFF. ON JUNE 28, 2012, WHEN THE CONSUMERS FATHER RETURNED HOME, HE PARKED THE VEHICLE IN THE GARAGE AND WENT IN THE HOUSE. HOURS LATER, THE CONSUMERS FATHER WAS FOUND DECEASED IN THE HOUSE FROM CARBON

---

[88] *Id.* at 4 (emphasis added).
[89] *Id.* at 16.

MONOXIDE POISONING. [...] AFTER HER DAD TOOK HIS PACKAGES OUT OF THE CAR AND INTO THE HOUSE, HE CLOSED THE GARAGE, AND NEVER SHUT OFF THE REMOTE STARTER BUTTON. FROM MORNING ALL THROUGH THE DAY, CARBON MONOXIDE SLOWLY SEEPED IN THE KITCHEN WHERE THE GARAGE WAS ATTACHED, THROUGH THE KITCHEN AND INTO THE DEN WHERE HER DAD WAS SITTING. **THE CONSUMER STATED HAD THERE BEEN AN AUTOMATIC SHUT OFF SYSTEM THAT ACTIVATED AFTER A PRESET TIME, WHEN THERE WAS NO WEIGHT IN THE DRIVER'S SEAT, MUCH LIKE THE AIR BAGS ON THE PASSENGER SIDE, THIS SENSELESS TRAGEDY WOULD HAVE NEVER OCCURRED**.[90]

(o)     On April 5, 2013, a person with a Nissan Group vehicle, a Nissan Altima, filed NHTSA complaint number 10507204, stating:

I WAS DRIVING A BRAND-NEW, NISSAN ALTIMA RENTAL CAR ON A BUSINESS TRIP. AFTER I RETURNED TO MY HOTEL ONE AFTERNOON, I FORGOT TO TURN THE ENGINE OFF. THIS VEHICLE HAS A KEY FOB AND A "START/STOP" BUTTON ONLY. THERE IS NO METAL KEY. AFTER I EXITED THE VEHICLE, I NOTICED THAT THE HORN DID NOT HONK WHEN I LOCKED THE VEHICLE WITH THE KEY FOB. THE TRUNK RELEASE DID NOT AUTOMATICALLY OPEN WHEN I USED THE KEY FOB. I MANUALLY PRESSED A BUTTON UNDER THE TRUNK LID TO RETRIEVE MY BAG. THE NEXT MORNING, I NOTICED STEAM AND WATER COMING OUT OF THE EXHAUST TAILPIPES. (IT WAS APP. 34 DEGREES THAT MORNING.) I DISCOVERED THAT THE ENGINE WAS STILL RUNNING, AND THE CAR USED APP[ROXIMATELY] 3/8S OF A TANK OF GASOLINE OVERNIGHT. MY CONCERN IS THAT A CAR LIKE THIS COULD BE DRIVEN INTO A GARAGE WITH THE ENGINE LEFT ON, AND THEN THE OCCUPANTS OF THE RESIDENCE COULD GET CARBON MONOXIDE POISONING FROM THE EXHAUST FUMES. THIS VEHICLE NEEDS SOME TIME [sic, KIND] OF WARNING BELL, CHIME, ETC. TO REMIND THE DRIVER THAT THE ENGINE IS STILL RUNNING IF THEY

---

[90] *Id.* at 14 (emphasis added).

OPEN THE DRIVER'S SIDE DOOR AND/OR EXIT THE VEHICLE.[91]

(p)     On July 19, 2013, a person with a Toyota Group vehicle, a 2012 Toyota Camry, filed NHTSA complaint number 10525838, stating:

AT LEAST FOUR OCCASIONS THE MOTOR HAS REMAINED RUNNING AFTER I LEFT THE CAR....THIS CAR HAS PUSH BUTTON IGNITION....DID I NOT TURN IF OFF PROPERLY OR IS THERE A SYSTEM MALFUNCTION....I PARK MY CAR IN AN ATTACHED GARAGE TO OUR HOUSE AND THE DOOR TO OUR HOUSE FROM THE GARAGE IS LEFT OPEN IN THE SUMMER FOR VENTILATION.....IF THE CAR REMAINED RUNNING UNKNOWN TO US DURING THE NIGHT WE WOULD PERISH FROM THE CARBON MONOXIDE FUMES....I FEEL THIS IS A SAFETY ISSUE THAT NEEDS TO BE ADDRESSED BY TOYOTA, IF NOT ONLY FOR US BUT OTHER TOYOTA CAMRY OWNERS....SO FAR TOYOTA HAS NOT ADDRESSED THIS ISSUE TO OUR SATISFACTION....**IN FACT THE OWNER OF THE DEALERSHIP WHERE WE PURCHASED THE CAR LAUGHED AT OUR SAFETY CONCERN**.....THE ALARM SYSTEM +ON THE CAR IS USELESS AS THE ALARM IS THE SAME WHEN I START THE CAR AS WHEN I STOP THE CAR AND HAVE THE DOOR OPEN OR IF DO NOT TURN OFF THE ENGINE AND GET OUT OF THE CAR AND CLOSE THE DOOR....ALL THESE ALARMS SOUND THE SAME AND MAKE THEM INEFFECTIVE....I HAVE A HEARING PROBLEM RELATED TO EAR SURGERY REPLACING MY BONES OF HEARING BY AN IMPLANT IN MY RIGHT EAR WHICH ALSO MAKES IT HARD FOR ME TO HEAR IF THE ENGINE IS RUNNING OR TURNED OFF.....THE ALARM SYSTEM ON THIS CAR NEEDS TO BE MODIFIED TO ENSURE NOTIFICATION TO THE DRIVER IF THE ENGINE IS RUNNING. ...[92]

(q)     On July 31, 2014, a person with a Nissan Group vehicle filed NHTSA complaint number 10617949, stating:

THIS VEHICLE HAS A PUSH BUTTON ENGINE SHUT OFF BUTTON. I WENT TO A SHOPPING

---

[91] *Id.* at 13.
[92] *Id.* at 12 (emphasis added).

MALL AND FORGOT TO SHUT OFF THE ENGINE. WHEN I RETURNED APPROX. 1 HOUR LATER, THE ENGINE WAS STILL RUNNING. I AM CONCERNED SHOULD THIS HAPPEN WHEN I PARK THE AUTO IN MY CLOSED GARAGE WHICH IS LOCATED DIRECTLY BELOW A BEDROOM. THE ENGINE WILL BE RUNNING ALL NIGHT AND THE BEDROOM WILL BE FILLED WITH CARBON MONOXIDE RESULTING IN DEATH TO THE OCCUPANTS. **THE VEHICLE NEEDS A TIME DELAY SHUT OFF SHOULD THE DRIVER FORGET TO SHUT OFF THE ENGINE. THE TIME DELAY COULD BE SET BY THE MANUFACTURER AND SHOULD BE APPROXIMATELY 15 TO 20 MINUTES OTHERWISE THE ENGINE WILL RUN FOREVER**.[93]

(r)     On August 12, 2014, a person with an FCA Group vehicle filed NHTSA complaint number 10694821, stating:

THIS IS A SAFETY CONCERN REGARDING THE ENGINE STARTING/STOP BUTTON WHEN OPERATING THE VEHICLE USING THE START/STOP BUTTON YOU CAN EXIT THE VEHICLE WITH THE ENGINE RUNNING WITHOUT ANY TYPE OF WARNING SIGNAL THAT THE ENGINE IS STILL RUNNING SUCH AS A WARDING [sic, WARNING] CHIME HORN BEEP OR A VIBRATION ON THE KEY FOB. IT IS EASY TO FORGET TO PRESS THE STOP BUTTON WHEN LEAVING THE VEHICLE. AS WE HAVE EXPERIENCED SEVERAL TIMES. THE DANGEROUS CONCERN WITH THIS LACK OF A SAFETY NOTIFICATION IS THE CAR CAN BE LEFT RUNNING IN AN ENCLOSED GARAGE SPREADING DEADLY CARBON MONOXIDE THROUGH A HOME.[94]

(s)     Two injuries were reported associated with a person with a GM Group vehicle, a Chevrolet Volt, described in NHTSA complaint number 10658921, filed on November 18, 2014:

THE INCIDENT OCCURRED ON 8/27/14, AND RESULTED IN MY WIFE [AND] ME [BEING]

---

[93] *Id.* at 11 (emphasis added).
[94] *Id.* at 3.

TAKEN TO THE HOSPITAL AND TREATED FOR CARBON MONOXIDE POISONING. THE INCIDENT OCCURRED AT OUR HOME. THE VOLT WAS PARKED IN THE ENCLOSED GARAGE ON 8/26 AROUND 7PM. THE 240 VOLT CHARGER WAS PLUGGED IN AS USUAL. I DID NOT NOTICE ANYTHING UNUSUAL AFTER PLUGGING IN THE CHARGER, AND THE VOLT WAS LEFT UNATTENDED UNTIL THE EMS ARRIVED AROUND 11AM THE FOLLOWING DAY. THE EMS PERSONNEL FOUND THE ENGINE RUNNING, VERY HIGH LEVELS OF CO UPON ENTERING THE GARAGE AND EVEN HIGHER LEVELS INSIDE THE CAR. THE INSIDE OF THE PASSAGE COMPARTMENT WAS DESCRIBED AS HOT. THE FRONT EXTERIOR OF THE CAR WAS TO HOT TO TOUCH AND THE CAR REAR WARM. THE TEMPERATURE UNDER THE CAR HOOD WAS DESCRIBED AS "RED HOT". THE ENGINE HAD CONSUMED AROUND 5 GALLONS OF GAS DURING THIS TIME PERIOD. DISTRIBUTION OF THE CO THROUGHOUT THE HOUSE WAS PROBABLY CAUSED BY THE A/C AIR HANDLER WHICH IS LOCATED INSIDE THE GARAGE. …[95]

(t)     Two injuries were reported associated with a person with a Toyota Group vehicle, a 2009 Toyota Camry, described in NHTSA complaint number 10654360, filed on December 2, 2014:

CONSUMER STATED ENGINE DID NOT TURN OFF EVEN AFTER PUSHING THE POWER OFF BUTTON. THE CAR WAS PARKED IN THE GARAGE OVER A PERIOD OF TIME. CONSEQUENTLY, CARBON MONOXIDE ENTERED THE CONSUMER'S HOME. SHE AND HER HUSBAND WENT TO THE HOSPITAL FOR CARBON MONOXIDE POISONING. CONSUMER STATED ENGINE DID NOT TURN OFF EVEN AFTER PUSHING THE POWER OFF BUTTON. THE CAR WAS PARKED IN THE GARAGE OVER A PERIOD OF TIME. CONSEQUENTLY, CARBON MONOXIDE ENTERED THE CONSUMER'S HOME. SHE AND HER HUSBAND WENT TO THE HOSPITAL FOR CARBON MONOXIDE POISONING. …[96]

---

[95] *Id.* at 9.
[96] *Id.* at 10.

(u)     Three injuries were reported associated with a person with a GM Group vehicle, a Chevrolet Volt, as described in NHTSA complaint number 10694821, filed on March 17, 2015:

> ON MARCH 2, 2015, THREE PEOPLE WENT TO AN EMERGENCY DEPARTMENT (ED) FOR CO POISONING. A 40 YEAR OLD MALE PARKED HIS 2012 CHEVROLET VOLT IN THE GARAGE TO CHARGE (PLUGGED INTO THE OUTLET) AND ACCIDENTALLY LEFT THE CAR RUNNING OVERNIGHT. IN THE MORNING, HE NOTICED THE CAR WAS RUNNING AND HAD SWITCHED TO GASOLINE USE. HE AND HIS TWO CHILDREN COMPLAINED OF HEADACHE, WEAKNESS, CHEST PAIN, PALPITATION, AND DIZZINESS. CARBOXYHEMOGLOBIN (COHB) LEVELS WERE >15% FOR ALL THREE INDIVIDUALS. ON MARCH 12, 2015, SEVERAL NEWS MEDIA OUTLETS REPORTED THAT GM IS RECALLING ALL 2011-2013 CHEVROLET VOLTS (ABOUT 64,000) TO INSTALL UPDATES TO PREVENT CO POISONING WHEN THE DRIVER FORGETS TO SHUT OFF THE VEHICLE.[97]

(v)     On March 19, 2015, a person with a Nissan Group vehicle filed NHTSA complaint number 10695250, stating:

> SINCE I LEASED MY CAR IN MAY[ ]2014[.] I FORGOT TO TURN THE ENGINE OFF 4 TIMES. TWICE IT RAN ALL NIGHT IN MY GARAGE BUT FORTUNATELY THE GAS FUMES DID NOT ENTER MY HOUSE WHILE I WAS SLEEPING. […] **I AM ELDERLY AND HARD OF HEARING AND CAN HARDLY HEAR THE ENGINE RUNNING, I WEAR A HEARING AID. IT RUNS VERY QUIETLY.** ONCE I LOANED MY DAUGHTER THE CAR AND SHE ENCOUNTERED THE SAME PROBLEM OF NOT TURNING OFF THE ENGINE, I LEARN FROM INTERNET POST THAT COUNTLESS REPORTS HAVE BEEN MADE AND SEVERAL DEATHS BY CARBON MONOXIDE ENTERING HOMES HAVE OCCURRED DUE TO THIS PROBLEM, I UNDERSTAND THE KEYLESS IGNITION SYSTEM HAS BEEN AROUND FOR MANY YEARS AND IS INSTALLED IN MANY DIFFERENT VEHICLES, I WAS NOT AWARE OF IT

---

[97] *Id.* at 2 (emphasis added).

UNTIL I GOT MY CAR. I FEEL A SAFETY RECALL SHOULD BE ISSUED TO CORRECT THE PROBLEM BEFORE MORE PEOPLE GET KILLED, THE PUBLIC SHOULD BE MADE AWARE OF IT WITHOUT FURTHER DELAY SINCE COUNTLESS REPORTS HAVE ALREADY BEEN MADE.[98]

(w)     On April 28, 2015, a person with an FCA Group vehicle filed NHTSA complaint number 10713276, stating:

ON THE KEYLESS START SYSTEM THERE IS NO WARNING THAT THE ENGINE IS RUNNING WHEN YOU OPEN THE DOOR. THE DOOR CAN BE LOCKED AND YOU WALK AWAY WITH THE VERY QUIET ENGINE RUNNING. HAD THIS HAPPENED WITH THE VEHICLE PARKED IN MY GARAGE THE HOUSE WOULD FILL WITH CARBON MONOXIDE AND SOMEONE COULD DIE.[99]

(x)     On June 9, 2015, a person with a Nissan Group vehicle filed NHTSA complaint number 10724386, stating:

I NEGLECTED TO PUSH THE START/STOP BUTTON UPON EXITING THE CAR. CONSEQUENTLY, THE CAR CONTINUED TO RUN. AT 10:30 PM, NEEDING A TOOL, I WENT BACK AND OPENED THE GARAGE DOOR. A RUSH OF HOT AIR HIT ME IN THE FACE. TO MY HORROR, I REALIZED THAT I DID NOT SHUT THE CAR OFF. GARAGE TEMPERATURE HAD TO BE ABOUT 120 DEGREES. WHO KNOWS WHAT COULD HAVE HAPPENED, HAD THE CAR RUN ALL NIGHT. **I THINK THERE'S A SIMPLE EASY INEXPENSIVE FIX TO THIS. SOLUTION: REQUIRE ALL AUTO MANUFACTURERS, UTILIZING THE KEYLESS IGNITION OPTION, TO, MANDATORILY, EQUIP ALL VEHICLES WITH AN AUTOMATIC SHUT OFF IF A CAR IDLES IN PARK (TRANSMISSION SELECTION) FOR MORE THAN 20 MINUTES.** THIS SAFETY OPTION SHOULD NOT BE ABLE TO BE OVER RIDDEN BY CUSTOMER. I'M JUST THANKFUL THAT MY GARAGE WAS DETACHED.

---

[98] *Id.* at 8.

[99] *Id.* at 7.

CARBON MONOXIDE DEATHS VIA KEYLESS IGNITION ARE EASILY AVOIDABLE.[100]

(y)   On June 29, 2015, a person with a Nissan Group vehicle filed NHTSA complaint number 10744763, stating:

> I LIVE IN A ONE FAMILY HOUSE WITH AN ATTACHED GARAGE. MY WIFE PARKED THE CAR, WITH 1/3 OF A TANK OF GAS, IN OUR GARAGE ABOUT 6:30 PM ON AUGUST 17. SHE THOUGHT SHE HAD PUSHED THE BUTTON TO TURN OFF THE ENGINE, AND EXITED THE CAR TAKING THE SMART KEY WITH HER. ABOUT 9 THE NEXT MORNING, WHILE WALKING MY DOG, I FELT HEAT COMING FROM THE GARAGE AND OPENED THE DOOR. IT WAS VERY HOT TO TOUCH. I THEN TOUCHED THE CAR AND BURNED MY HAND. I CALLED OUR LOCAL FIRE DEPARTMENT AND THEY PULLED THE CAR OUT OF THE GARAGE. THE CAR WAS SO HOT, A CD IN THE DOOR COMPARTMENT MELTED. THE FIREMEN EXPLAINED THAT MY WIFE AND I AND OUR DOG, COULD VERY EASILY HAVE BEEN KILLED BY CARBON MONOXIDE AND THE ENTIRE STRUCTURE COULD HAVE BURNED FROM THE HEAT. I HAVE SINCE LEARNED THAT **WHAT HAPPENED TO ME IS A COMMON OCCURRENCE AND PEOPLE HAVE DIED AS A RESULT. EVEN IF THE SMART KEY IS NOT NEAR THE CAR, IT WILL CONTINUE TO RUN UNTIL IT IS OUT OF GAS**.[101]

(z)   On August 28, 2015, a person with a Toyota Group vehicle filed NHTSA complaint number 107605523, stating:

> I PARKED THE CAR IN MY INDOOR GARAGE (PART OF THE INTERIOR OF MY HOME). SEVERAL HOURS LATER, I BEGAN TO FEEL ILL AND COLLAPSED ON THE FLOOR. I WAS ABLE TO CALL 911 AND AN EMERGENCY CREW RESPONDED TO MY HOME. I WAS UNABLE TO OPEN THE DOOR, BUT THEY WERE ABLE TO GAIN ACCESS. THEY IMMEDIATELY DETERMINED THAT MY HOME WAS FILLED WITH CARBON MONOXIDE AND FOUND THAT THE SOURCE WAS THE CAR IN THE GARAGE.

---

[100] *Id.* at 6 (emphasis added).

[101] *Id.* at 31 (emphasis added).

1
2
3
4
5
6
7

THEY DETERMINED THAT THE CAR'S ENGINE HAD BEEN LEFT ON AND THE BATTERY WAS DEAD. THIS WAS THE RESULT OF ME **WALKING AWAY FROM THE CAR, WHICH HAS A "SMART-KEY" IGNITION, WITH THE ENGINE STILL RUNNING. I DID NOT HEAR ANY ALERT FROM THE CAR WARNING ME THAT THE ENGINE WAS RUNNING.** THE MEDICS SAID THAT 5 MORE MINUTES IN MY HOME WOULD HAVE BEEN FATAL, AND I WAS RUSHED BY AMBULANCE TO A HOSPITAL, WHERE I REMAINED FOR 3 DAYS.[102]

8
9

(aa)    On August 31, 2015, a person with a Toyota Group vehicle filed NHTSA complaint number 10760561, stating:

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

OVER THE LAST COUPLE OF YEARS, AT LEAST 7 TIMES, I HAVE HAD MY CAR STAY RUNNING WHILE I AM AT A RESTAURANT OR WHEN I RETURN HOME. I PARK OUTSIDE AND AT LEAST 3 TIMES OVER THE LAST 6 YEARS NEIGHBORS HAVE CALLED AND SAID DID YOU KNOW THAT YOUR CAR ENGINE WAS RUNNING. ABOUT THREE WEEKS AGO, IN EARLY AUGUST, I WAS AT A RESTAURANT IN CLINTON, NEW YORK WHERE THE CAR WAS RUNNING ON THE STREET SEVERAL BLOCKS AWAY FOR THE WHOLE TIME WE WERE IN THE RESTAURANT. EACH TIME I THOUGHT I'D PUT MY FOOT ON THE BRAKE AND PUSHED IN THE BUTTON TO SHUT OFF THE CAR. I AM SO GLAD THAT YOU ARE INVESTIGATING THIS. IF **I HAD AN INTERIOR GARAGE WHERE I PARKED AT MY HOME, I COULD HAVE KILLED PEOPLE WITH THE BUILD UP OF THE CARBON MONOXIDE. I CAN'T SEE WHY TOYOTA CAN'T HAVE A BLINKING LIGHT WHEN THE CAR IS ON OR HAVE THE CAR AUTOMATICALLY CUT OFF AFTER A FEW MINUTES.** ONE OTHER THING, IS THAT MY CAR, WHICH I LOVE, RUNS SO QUIETLY, THAT **IT IS ALMOST IMPOSSIBLE TO HEAR THE ENGINE WHEN IT IS IDLING**. THANK YOU SO MUCH FOR INVESTIGATING THIS SERIOUS ISSUE.[103]

27
28

---

[102] *Id.* at 30 (emphasis added).
[103] *Id.* at 29 (emphasis added).

1      (bb)   On September 1, 2015, a person with a Hyundai/Kia Group

2   vehicle filed NHTSA complaint number 10760623, which reported one injury,

3   stating:

> THE CONTACT OWNS A 2014 HYUNDAI SONATA.
> THE CONTACT STATED THAT THE KEYLESS
> START FUNCTIONALITY DID NOT PERFORM AS
> INTENDED, WHICH RESULTED IN CARBON
> MONOXIDE SPREADING THROUGHOUT THE
> RESIDENCE. **WHEN THE VEHICLE WAS
> PURCHASED, THE DEALER INFORMED THE
> CONTACT THAT THE KEYLESS START
> SYSTEM IN THE VEHICLE HAD AN IDLE
> TIMER THAT WAS SUPPOSED TO SHUT THE
> VEHICLE OFF WHEN IDLING FOR A PERIOD
> OF TIME**. THE CONTACT REQUIRED MEDICAL
> ATTENTION AND THE PHYSICIAN DIAGNOSED
> THAT THE CONTACT HAD CARBON MONOXIDE
> POISONING.     THE     VEHICLE     WAS     NOT
> DIAGNOSED. THE MANUFACTURER WAS NOT
> MADE     AWARE     OF     THE     ISSUE.     THE
> APPROXIMATE FAILURE MILEAGE WAS 10,000[104]

(cc)   On September 5, 2015, a person with a Hyundai/Kia Group

vehicle filed NHTSA complaint number 10762451, stating:

> THIS HYUNDAI SONOTA [SIC] HAS A PUSH
> BUTTON IGNITION. ONCE THE ENGINE IS
> STARTED, A PERSON CAN LEAVE THE VEHICLE
> WITH THE KEY FOB IN THEIR POCKET AND THE
> ENGINE STAYS RUNNING AND WILL NOT SHUT
> OFF. … ONCE THE KEY IS REMOVED FROM THE
> VEHICLE THE ENGINE SHOULD SHUT OFF. THIS
> ENGINE IS SO QUIET YOU CANNOT EVEN HEAR
> IT RUNNING WHILE IN THE VEHICLE AND IF
> SOMEONE IS PARTIALLY COLOR BLIND YOU
> CAN     BARELY     SEE     THE     RED     AND     GREEN
> INDICATOR. THIS ENGINE WILL RUN IN AN IDLE
> STATE NO MATTER WHERE THE KEY CAUSING
> RISK OF FIRE, CARBON MONOXIDE POISINING
> [SIC] AND DEATH AND INJURY TO ANYONE
> NEAR THIS VEHICLE IF LEFT RUNNING AND
> SINCE THE CAR STAYS RUNNING ONCE IT IS
> STARTED ANYONE CAN WALK AWAY WITH THE
> KEY FOB IN THEIR POCKET AND THE CAR
> STAYS RUNNING NO MATTER WHAT. THERE

---

[104] *Id.* at 28 (emphasis added).

ARE NO REMINDERS WHEN EXITING THE VEHICLE THAT THE ENGINE IS RUNNING, THERE IS NO AUTOMATIC SHUT OFF IN THE VEHICLE, THERE ARE NO REMINDERS IN THE VEHICLE THAT THE ENGINE IS RUNNING. THE PUSH BUTTON STARTS ARE NOT ONLY A SAFETY THREAT BUT ALSO CAN BE HAZARD IN A PARKING GARAGE IF THE ENGINE CATCHES FIRE DUE TO OVER HEATING IT CAN AFFECT ALL THE OTHER VEHICLES IN A PARKING GARAGE AND CAUSE EVEN WORSE DAMAGE[105]

(dd)   On October 9, 2015, a person with an FCA Group vehicle filed NHTSA complaint number 10780974, stating:

THE 2015 JEEP GRAND CHEROKEE LIMITED COMES WITH PUSH BUTTON STARTING. WITH THE CAR LEFT RUNNING AND THE FOB KEY TAKEN AWAY FROM THE VEHICLE, **THE CAR CONTINUES TO RUN FOR HOURS**. IF IT IS NOT LOCKED, ANYONE CAN SIMPLY GET IN AND DRIVE IT AWAY TO UNLIMITED DISTANCES. IF SOMEONE PARKS THE CAR IN A GARAGE AND FORGETS TO TURN IT OFF, **IT WILL RUN FOR HOURS, FILL THE GARAGE/HOUSE WITH CARBON MONOXIDE** AND HAS ALREADY BEEN IDENTIFIED AS THE CAUSE OF 13 DEATHS IN THE US. THE PUSH BUTTON STARTING WAS A BAD IDEA. THE SIMPLE KEY, USED FOR DECADES, ALLOWED THE CAR TO BE STARTED, AND **WHEN THE KEY WAS SHUT OFF AND REMOVED, THE CAR WAS SHUT DOWN. SIMPLE!** IN MY OPINION THE PUSH BUTTON STARTING WAS A BAD IDEA AND NEEDS TO BE REVISED. IF THE FOB KEY LEAVES THE CAR, AND THE CAR IS STILL RUNNING, THE CAR ALARM SHOULD GO OFF, WARNING THE DRIVER THAT THE CAR NEEDS TO BE SHUT DOWN FIRST.[106]

(ee)   On October 19, 2015, a person with a GM Group vehicle filed NHTSA complaint number 10783539, stating:

TWICE I HAVE WALKED BACK TO MY CAR & FOUND THAT THE ENGINE HAS REMAINED ON. AFTER PARKING, I PRESS THE ENGINE ON/OFF

---

[105] *Id.* at 27 (emphasis added).
[106] *Id.* at 34 (emphasis added).

BUTTON, EXIT THE CAR, LOCK ALL DOORS WITH THE FOB AND WALK AWAY. THIS TIME, **I PARKED IN A VERY LARGE, CROWDED PUBLIC PARKING LOT. I WAS AT LEAST 6 BLOCKS AWAY FROM THE CAR FOR 2 HOURS.** THANKFULLY, THIS HAS OCCURRED WHEN THE CAR IS OUTSIDE, NOT IN MY GARAGE. IN RECENT LIGHT OF PEOPLE SUCCUMBING TO CARBON MONOXIDE POISONING DUE TO THIS VERY SITUATION OCCURRING WITH CARS IN CLOSED GARAGES, I WOULD EXPECT A VOLUNTARY OR FORCED RECALL TO REMEDY THIS GM ADMITTED DESIGN DECISION.[107]

(ff)    On October 28, 2015, a person with a Ford vehicle filed NHTSA complaint number 10806904 with a report of two deaths, stating:

CONSUMER STATED HER **BROTHER WALKED INTO HORRIBLE SCENE AND FOUND BOTH OF THEIR PARENTS DEAD**. THE CAUSE WAS CARBON MONOXIDE POISONING FROM A 2013 LINCOLN MKS VEHICLE THAT WAS INADVERTENTLY LEFT RUNNING IN THEIR GARAGE. **THE VEHICLE HAD A KEYLESS IGNITION SYSTEM THAT FAILED TO HAVE AN AUTOMATIC SHUTOFF** OR AN ADEQUATE AUDIBLE ALARM.[108]

155.    These consumer complaints and reports to NHTSA are consistent. Each one outlines the safety issues associated with the Defect, and the complaints put FCA Group on actual notice of the exact, simple, and basic remedy sought here: Auto-Off.

**I.      FCA Group has (and had) Actual Knowledge of the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs that lack Auto-Off through Various Non-Binding NHTSA Suggestions**

156.    Upon information and belief, FCA Group regularly reviews NHTSA proposed rules, various stakeholders' responses to those proposed rules, NHTSA-related entries on the Federal Register, and NHTSA's interpretation letters sent in response to manufacture guidance requests.

---

[107] *Id.* at 33 (emphasis added).
[108] *Id.* at 32 (emphasis added).

157.   On August 15, 2002, in a public interpretation letter (directed to Nissan Group, specifically), NHTSA warned of the human-factors implications of Keyless Fob systems. Specifically, NHTSA stated that Keyless Fobs pose additional risks over Physical Keys because "the driver must physically touch a traditional key, unlike the 'Smart Key' device, as part of turning off the engine."

158.   On July 17, 2003, in a public interpretation letter, NHTSA again warned of the human-factors implications of Keyless Fob systems disrupting the traditional relationship between the driver and the Physical Key. NHTSA warned that disruption of the traditional relationship would have unintended consequences. Specifically, NHTSA stated that Keyless Fobs pose additional risks because "there appears to be a greater likelihood of drivers inadvertently leaving transceiver-type devices in the car, as compared to a traditional key. This is because the driver must physically touch a traditional key, unlike the transceiver-type device, as part of turning off the engine."

159.   On December 12, 2011, NHTSA published a Notice of Proposed Rulemaking, which has never been acted on or implemented, outlining the dangers of Keyless Fobs.[109] Specifically, NHTSA stated that "driver[s] may not immediately know that the propulsion system has not been turned off."[110] The NHTSA proposed rule outlined two incidents in which vehicle owners whose Keyless Fob cars were left with the engine running were lucky enough to have been alerted by in-home carbon monoxide detectors before death, but "[o]thers, not as fortunate, may have died because of carbon monoxide poisoning from their vehicles."[111] NHTSA explained the dangers succinctly: "If [a] vehicle [equipped

---

[109] Federal Motor Vehicle Safety Standards; Theft Protection and Rollaway Prevention, 76 Fed. Reg. 77,183, 77,200 (Dec. 12, 2011) (to be codified at 49 C.F.R. Part 571) (no final NHTSA rulemaking, codification, or denial has taken place as a result of this proposed rule).

[110] *Id.* at 77187.

[111] *Id.* at 77188.

with a Keyless Fob] is in an enclosed garage connected to living quarters, this situation [in which the engine remains running] may result in carbon monoxide poisoning of persons in the dwelling; if outdoors, this increases the possibility of vehicle theft and a subsequent crash."[112] And because Keyless Fobs are a technology new to most consumers "in many ignition systems that don't use physical keys, the driver may not know whether s/he has turned off the vehicle propulsion system."[113] Simply put, NHTSA stated that "with keyless ignition systems, it is not obvious to the driver that s/he has left the 'key' … behind and also it may not be obvious that the engine or other propulsion system is running."[114]

160.   While none of these NHTSA-related documents have resulted in any regulatory action or rule, they have made FCA Group aware of the dangerous carbon monoxide poisoning consequences of vehicles without Auto-Off and the human-factors implications of Keyless Fob systems disrupting the traditional relationship between the driver and the Physical Key. Thus, these NHTSA-related documents show that no later than August 15, 2002, FCA Group was aware of the human-factors implications of Keyless Fob systems disrupting the traditional relationship between the driver and the Physical Key, exacerbating these risks.

**J.    FCA Group has (and had) Actual Knowledge that the Dangerous Carbon Monoxide Poisoning Consequences of Vehicles with Keyless Fobs Can Be Fully Mitigated through the Implementation of Auto-Off**

161.   "Auto-Off" is feasible for FCA Group to implement—immediately.

162.   Auto-Off is not only feasible; it has *already* been implemented by several auto manufacturers to prevent the very Defect described herein.

---

[112] *Id.*
[113] *Id.*
[114] *Id.* at 77191.

163.   For example, and as noted above,[115] the GM Group has not only instituted an Auto-Off in its 2014-2015 model year Chevrolet Volts, due to safety concerns, it *recalled* all of its prior model year (2011-2013) Chevrolet Volts due to the lack of such a system because "carbon monoxide could build up in [an] enclosed space."[116]

164.   Given the prevalence of the Defect, FCA Group's failure to immediately implement Auto-Off is a material and unreasonable safety risk. As a result, FCA Group's nondisclosure of the Defect in Plaintiffs' and Class Members' sales brochures or any other pre-sale materials was (and remains) unreasonable.

165.   Upon information and belief, FCA Group regularly reviews (and attempts to emulate and implement) the technological innovations instituted by competitor Automakers, including those pertaining to automotive safety. Thus, the Auto-Off and related automatic shutdown systems described herein are within the actual knowledge of FCA Group.

### a.   The Ford Group has Implemented Auto-Off for *Some* of its Vehicles but has Failed to Implement Auto-Off in *All* of its Vehicles

166.   The 2014 and 2015 Lincoln MKS vehicles, manufactured and designed by the Ford Group, are equipped with a Keyless Fob but are *not* Affected Vehicles because for those vehicles Ford has instituted an Auto-Off system that: 1) shuts down the vehicle after 30-minutes of running if there is no user intervention, and 2) there is no "defeat" mechanism to override this important Auto-Off safety function.

167.   The Ford Group stated that the *reason* for implementing the life-saving Auto-Off technology was "in order to save battery power."

---

[115] *See* ¶¶ 137-139, *supra*.

[116] NHTSA Safety Recall 14617: *Defect Notice report*, www.nhtsa.dot.gov., http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM474874/RCLRPT-15V145-6748.PDF.

168.   Other 2013, 2014, and 2015 model year Ford Group vehicles have similarly instituted Auto-Off and are therefore not listed as Affected Vehicles.[117] Yet, despite the fact that the Ford Group has instituted Auto-Off in *some* of its most recent cars, it has failed to install or implement Auto-Off in any of its *older* model year vehicles, nor has it included Auto-Off in many of its newer vehicles, including the Affected Vehicles.[118] For example, Ford/Lincoln did not retroactively cure the Defect in the 2009-2013 Lincoln MKS even though it instituted Auto-Off in the later 2014-2015 Lincoln MKS Vehicles.

> **b.    The Honda Group has Implemented a *Battery-Saving* Accessory Mode Shut-Down since 2013 but not an *Engine* Auto-Off**

169.   In Honda Group vehicles, accessory mode allows consumers to operate the vehicle's radio, the cigarette lighter power port, and other USB power ports while the engine is turned off. Consumers with a Keyless Fob can turn the engine off while leaving the accessory mode on.

170.   Starting in 2013, the majority of Honda Group vehicles have instituted an automatic shut-down system if the consumer inadvertently leaves the vehicle's accessory mode on.[119] The shut-down system was designed as a convenience feature to prevent against "battery drain," since if left running, the accessory mode could eventually fully drain the vehicle's battery. As part of the shut-down system,

---

[117] The Ford Group has also installed Auto-Off in the following vehicles: the 2015 Ford Focus, the 2013-2015 Ford Edge, the 2014-2015 Ford Escape, the 2014-2015 Ford Flex, the 2013-2015 Ford Fusion, the 2013-2015 Ford Fusion Hybrid, the 2014-2015 Ford Fusion Energi, the 2015 Ford Mustang, the 2014-2015 Lincoln MKT, the 2013-2015 Lincoln MKZ, the 2013-2015 Lincoln MKZ Hybrid, the 2015 Lincoln MKC, and the 2015 Lincoln Navigator.

[118] *See, e.g.,* **Exhibit 1** (vehicles with Keyless Fobs that do have Auto-Off are not listed in this exhibit).

[119] The Honda Group has employed the identical battery drain "Automatic Power Off" technology in at least nine of its models, beginning in 2013: the Honda Accord Sedan, the Honda Accord Coupe, the Honda CrossTour, the Honda Civic Sedan, the Honda Civic Coupe, the Honda Odyssey, the Honda CR-V, the Acura MDX, and the Acura RLX. All of the aforementioned makes and models are Affected Vehicles.

the vehicle will automatically turn off the accessory mode after 30 to 60 minutes of vehicle inactivity.

171.   Honda Group's willingness to implement this shut-down system to prevent against battery drain (a minor inconvenience rather than a deadly safety risk) is particularly egregious in light of its failure to implement Auto-Off to ensure that Affected Vehicles' engines do not continuously emit deadly carbon monoxide.

172.   As described herein, if Auto-Off was implemented to stop the vehicle's engine, it would save lives and prevent serious injuries and hospitalizations – a far more important fix than preventing the inconvenience of a dead car battery.

       **c.**    **The Vast Majority of the Automakers have Recognized the Danger of Carbon Monoxide by Implementing an Automatic Shut Down System for *Remote-Start* Vehicles but not for *Keyless Fob* Vehicles**

173.   Most of the Automaker Groups, save for BMW Group and MB Group, have instituted a vehicle ignition technology commonly referred to as "Remote Start." The Remote Start system allows consumers the flexibility and convenience of starting their vehicles' engines without actually being inside the vehicles. In other words, the Remote Start system allows the driver to *pre*-start the engine remotely.

174.   While the Keyless Fobs described in this Complaint allow a consumer to enter the vehicle and to turn on the engine without removing the Keyless Fob from his/her pocket, the Remote Start takes the technology one step further by allowing consumers the convenience of turning the engine on before opening the vehicle's door.

175.   The Remote Start system is a particularly attractive feature to many consumers because it allows a vehicle to be started from the comfort of their home or office. As a result, as soon as the consumer activates the Remote Start system,

1    the vehicle's air conditioning/heating system can cool or warm the vehicle before

2    the consumer even opens the door.

3         176.   Strikingly, many of the Automakers have implemented systems that

4    are the functional equivalent of Auto-Off, except the automatic-shutdown

5    functionality is only used if the engine is *pre*-started using the Remote Start

6    function. Upon information and belief, each of the below-listed Automaker Groups

7    has universally implemented a feature to automatically shut down the vehicles'

8    engines when *Remote Start* is used, **but not** when Keyless Fobs are used to start

9    the vehicles from the inside. Each of the below-listed vehicles is the first model by

10   each Automaker Group to integrate Remote Start:

11        (a)   Ford Group: 2009 Lincoln MKS

12        (b)   Toyota Group: 2007 Toyota Camry

13        (c)   Nissan Group: 2013 Infiniti JX

14        (d)   Honda Group: 2010 Acura ZDX

15        (e)   FCA Group: 2011 Jeep Grand Cherokee

16        (f)   Hyundai/Kia Group: 2012 Hyundai Sonata

17        (g)   General Motors: 2005 Cadillac STS

18        (h)   VW Group: 2013 Volkswagen Passat

19        177.   The same technology that the above Automakers have implemented to

20   limit carbon monoxide emissions, and thereby prevent carbon monoxide deaths

21   and injuries in a Remote Start vehicle has **not** been implemented on ordinary

22   Keyless Fob vehicles.

23        178.   Each of the above-listed Automaker Groups therefore recognized,

24   acknowledged, and implemented a fail-safe shut-down solution for addressing the

25   risks of carbon monoxide when creating its respective Remote Start features but

26   not for the very same vehicle's Keyless Fob technology.

27        179.   Each of the above-listed Automaker Groups therefore had knowledge

28   of the dangers of carbon monoxide poisoning for unattended vehicles with their

engines left running at least as early as the dates of the designs of each of the makes and models listed in Paragraph 176.

## VI.   EXCLUSIVE KNOWLEDGE, CONCEALMENT, AND SAFETY DEFECT ALLEGATIONS

180.   Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals associated with FCA Group responsible for disseminating false and misleading marketing materials (i.e., the marketing materials with material omissions) regarding its Affected Vehicles. FCA Group is necessarily in possession of all of this information.

181.   Plaintiffs' claims arise out of FCA Group's exclusive knowledge of and/or concealed material information regarding the Defect and the safety hazard it poses. There is no one document or communication, and no one interaction, upon which Plaintiffs base their claims. Plaintiffs allege that at all relevant times, specifically at the time they purchased or leased their Affected Vehicles, FCA Group knew the safety dangers of not including Auto-Off. FCA Group was under a duty to disclose the Defect based upon its exclusive knowledge of and/or concealed material information regarding the Defect; FCA Group failed to disclose the Defect to Plaintiffs or the public at any time or place or in any manner such that it could (and would) have affected Plaintiffs and the Classes' pre-sale decision to purchase and/or lease its Affected Vehicles.

182.   Plaintiffs make the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to FCA Group:

(a)     **Who**: FCA Group had and has exclusive knowledge of the Defect and failed to disclose to Plaintiffs and/or concealed material information regarding the Defect from Plaintiffs. FCA Group similarly failed to disclose the Defect's dangerous safety risks in its Affected Vehicles. Plaintiffs are unaware of,

1   and therefore unable to identify, the true names and identities of those specific

2   individuals responsible for such decisions.

3        (b)   **What**:

4        (i)   FCA Group failed to disclose that its Affected Vehicles

5   contain the Defect. FCA Group has and had exclusive knowledge of and/or

6   concealed material information that its Affected Vehicles contain the Defect. Yet

7   FCA Group failed to disclose the same in the sales brochures or any other pre-sale

8   materials.[120]

9        (ii)   FCA Group could have, but failed to, disclose to

10   consumers the risks of vehicles with Keyless Fobs that lack Auto-Off. An

11   exemplar of a simple but effective disclosure that was omitted from any and all of

12   its Affected Vehicles' pre-sale materials is:

13        **WARNING**: This vehicle is equipped with a keyless

14   ignition. Once the engine is started, the engine will
continue to run even if the vehicle is parked and even if

15   the keyless ignition fob is removed from the vehicle. This
vehicle's engine will never automatically turn off absent

16   affirmative user interaction. If your keyless-fob equipped
vehicle remains running, you and those who are nearby

17   your vehicle are at an increased risk of carbon monoxide
poisoning, **which may result in injury or death**,

18   especially if the vehicle remains running in an enclosed
environment such as a garage. Carbon monoxide is an

19   odorless and colorless gas that cannot be detected by any
of the human senses.

20

21        (c)   **When**: FCA Group had exclusive knowledge of and/or

22   concealed material information regarding the Defect starting no later than the date

23   of introduction of certain models of Affected Vehicles to the market, continuing

24   through the time of sale for each of its Affected Vehicles.[121]

25   _____

26   [120] *See* **Exhibits 4-6** (automotive pre-sale sales brochures reviewed by each of
the respective Plaintiffs).

27   [121] Further, since 2002, Each of the Automakers had exclusive knowledge of
and/or concealed material information regarding the Defect because that is the date

28   when NHTSA issued an interpretation letter regarding the human-factors analysis

*(continued)*

1    (d)    ***Where***: FCA Group concealed material information regarding

2    the true nature of the Defect in every pre-sale communication they had with

3    Plaintiffs and the Class. Despite counsel's review and analysis of marketing

4    materials, sales brochures, and other pre-sale enticements to purchase each of its

5    Affected Vehicles, Plaintiffs are aware of no document, communication, or other

6    place or thing, in which FCA Group disclosed the truth about the Defect in its

7    Affected Vehicles to consumers. Such information is not disclosed in any pre-sale

8    documents, displays, advertisements, on FCA Group's websites, or on any other

9    pre-sale communication.

10    (e)    ***How***:

11    (i)    FCA Group had exclusive knowledge of and/or

12    concealed material information about the Defect and failed to disclose the Defect

13    to Plaintiffs and Class Members in any pre-sale materials—the time at which

14    Plaintiffs and the Class could have acted. FCA Group had exclusive knowledge of

15    and/or actively concealed the truth about the existence and nature of the Defect

16    from Plaintiffs and Class Members at all times, even though FCA Group knew

17    about the Defect and knew that information about the Defect would be important to

18    a reasonable consumer.

19    (ii)    FCA Group has failed to disclose the truth about the

20    Defect in its Affected Vehicles to consumers. Thus, FCA Group has never taken

21    any action to inform consumers about the true nature of the Defect in its Affected

22    Vehicles despite the fact that FCA Group had exclusive knowledge of and/or

23    actively concealed the truth about the existence and nature of the Defect.

24    (iii)    Exclusive knowledge of and/or concealed material

25    information about the Defect applicable to FCA Group, in chronological order:

26

27    *(continued)*
as to disconnect between drivers' understanding of Keyless Fobs when compared

28    to Physical Keys. *See* ¶ 157, *supra*.

1          a.      **August 15, 2002** – NHTSA issued an

2   interpretation letter warning manufacturers of the human-factors implications of

3   Keyless Fob systems disrupting the traditional relationship between the driver and

4   the Physical Key;[122]

5          b.      **November 16, 2007** – Magna Electronics Inc.

6   applied for the first third-party patent concerning a proposed Auto-Off system to

7   prevent the dangerous carbon monoxide risks caused by an unattended vehicle left

8   running in an enclosed environment;[123]

9          c.      **April 6, 2009** – The first of thirty-five consumer

10  complaints was submitted to NHTSA about the carbon monoxide poisoning risks

11  posed by Keyless Fobs without Auto-Off;[124] and

12         d.      **November 1, 2011** – Ford filed for a patent,

13  application number 2013/0110374, to address the Defect by proposing an Auto-Off

14  system.[125]

15         e.      Further, although FCA Group, upon information

16  and belief, knew of all of the following facts pertaining to other Automaker

17  Groups, Plaintiffs list FCA Group's knowledge as to their own actions (and

18  inactions) here:

19                 (1)     **Late 2010** – FCA Group instituted a Remote

20  Start automatic shutdown system in its 2011 Jeep Grand Cherokee in order to limit

21  carbon monoxide emissions in pre-start situations;[126] and

22

23

24

25         [122] *See ¶ 157, supra.*
      [123] *See ¶ 145(a), supra.*
26    [124] *See ¶ 154(a), supra.*
      [125] *See ¶ 143, supra.*
27    [126] *See ¶ 176(e), supra.*

28

CLASS ACTION COMPLAINT                                                          72

1    (2)    **August 12, 2014** – The first of at least three

2  NHTSA consumer complaints specifically addressed to FCA Group described the

3  risks of carbon monoxide poisoning and Keyless Fobs;[127]

4    (3)    **April 28, 2015** – NHTSA complaint

5  regarding an FCA Group vehicle, asking that the Defect be remedied;[128] and

6    (4)    **October 9, 2015** – NHTSA complaint

7  regarding an FCA Group vehicle, a 2015 Jeep Grand Cherokee Limited, asking for

8  Auto-Off implementation.[129]

9    (f)    ***Why***: FCA Group concealed and/or had exclusive knowledge of

10  material information about the Defect in its Affected Vehicles yet failed to disclose

11  the Defect in order to induce Plaintiffs and Class Members to purchase or lease its

12  Affected Vehicles rather than competitors' vehicles. Had FCA Group disclosed the

13  truth, Plaintiffs (and reasonable consumers) either 1) would have paid less for the

14  Affected Vehicles by not purchasing optional equipment packages with the

15  Keyless Fob technology, or 2) would not have purchased or leased the Affected

16  Vehicles where the Keyless Fob was standard equipment, instead purchasing a

17  vehicle with a Physical Key or a vehicle with Auto-Off, or otherwise would have

18  paid less for the Affected Vehicles.

19    (g)    ***Safety Defect:***

20    (i)    FCA Group, like all Automakers, is under a duty to

21  disclose a known defect in a vehicle when there are safety concerns associated with

22  the vehicle's use – i.e., where the failure to disclose implicates a safety issue.

23  Manufacturers may be held liable for their failure to disclose a defect when such an

24  omission pertains to a safety issue. In this case, as stated above, FCA Group knew

25  about the Defect, and the Defect poses a physical threat to Plaintiffs' own safety or

26

27  [127] *See* ¶ 154(r), *supra.*
     [128] *See* ¶ 154(w), *supra.*

28  [129] *See* ¶ 154(dd), *supra.*

the safety of others. Nevertheless, FCA Group failed to disclose the Defect to all owners of Affected Vehicles.

(ii)    Moreover, FCA Group took partial steps to ensure that their Keyless Fob vehicles would go off automatically in order to limit excessive carbon monoxide emissions after starting the vehicles remotely. FCA Group did not, however, take similar steps after starting the vehicles when using the Keyless Fob "Start/Stop" button.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS

**A.    Fraudulent Concealment Tolling**

183.   Upon information and belief, FCA Group has known of the Defect in its Affected Vehicles since at least 2002,[130] if not earlier, and FCA Group has had such exclusive knowledge and concealed such facts from Plaintiffs, Class Members, and the public of the full and complete nature of the Defect.

184.   Any applicable statute of limitation has therefore been tolled by FCA Group's exclusive knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**B.    Estoppel**

185.   FCA Group was and is under a continuous duty to disclose to Plaintiffs and Class Members the true character, quality, and nature of its Affected Vehicles. FCA Group had exclusive knowledge of and/or actively concealed the true character, quality, and nature of its Affected Vehicles despite its exclusive knowledge that its Affected Vehicles were and are unsafe. FCA Group had exclusive knowledge of and/or concealed these facts. Based on the foregoing, FCA Group is estopped from relying on any statutes of limitation in defense of this action.

---

[130] This is the date of the first NHTSA attention to this matter. *See* ¶ 157, *supra*.

## C.      Discovery Rule

186.   The causes of action alleged herein did not accrue until Plaintiffs and Class Members discovered that their Affected Vehicles had the Defect. As discussed herein, many Plaintiffs only became aware of the Defect after multiple instances during which the Affected Vehicles were inadvertently left running.

187.   However, Plaintiffs and Class Members had no realistic ability to discern that the Affected Vehicles were defective until—at the earliest—after the first manifestation of the Defect. Even then, Plaintiffs and Class Members had no reason to know the Defect was caused by FCA Group's active concealment of the same. Not only did FCA Group fail to notify Plaintiffs or Class Members about the Defect, FCA Group has continued to deny any knowledge of or responsibility for the Defect. Thus, Plaintiffs and Class Members were not reasonably able to discover the Defect until after they purchased or leased the Affected Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until they personally discovered that the Defect can lead to carbon monoxide poisoning.

## VIII.  CLASS ACTION ALLEGATIONS

188.   Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other Class Members similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2) and (b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions. If, in any instance, the Court finds (b)(3) requirements are not met, Plaintiffs and Class Members alternatively seek certification under Federal Rules of Civil Procedure 23(a) and 23(c)(4).

189.   The Classes are defined as:

(a)      All persons in the State of California who purchased or leased an FCA Group Affected Vehicle (the "California Class");

(b)     All persons in the State of Connecticut who purchased or leased an FCA Group Affected Vehicle (the "Connecticut Class"); and

(c)     All persons in the State of New York who purchased or leased an FCA Group Affected Vehicle (the "New York Class").

(d)     Excluded from all of the Classes are: (1) FCA Group, any entity or division in which the FCA Group has a controlling interest, and its legal representatives, officers, directors, assignees, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) governmental entities; and (4) individuals who have suffered personal injuries as a result of the facts alleged herein.

190.   In the alternative, pursuant to Federal Rules of Civil Procedure 23(a) and 23(c)(5), Plaintiffs and Class Members reserve the right to propose class groupings of states that do not have materially different bodies of state law.

191.   Plaintiffs reserve the right to amend the Class if discovery and further investigation reveal that the Class should be expanded, otherwise divided into subclasses, or modified in any other way.

**A.     Numerosity & Ascertainability**

192.   Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough such that joinder is impracticable. Upon information and belief, the number of Affected Automobiles as outlined in **Exhibit 1** is in excess of 5,000,000 vehicles. Upon information and belief, the number of FCA Group's Affected Automobiles as outlined in **Exhibit 1** is in excess of 500,000 vehicles. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

193.   Class Members are readily identifiable from information and records in FCA Group's possession, custody, or control, including the VIN and/or

1    specifications sheets, as well as from records maintained by the various states'

2    Departments of Motor Vehicles.

3    **B.    Typicality**

4          194.   The claims of the putative representative Plaintiffs are typical of the

5    claims of others in the same state and with the same Automotive Group Affected

6    Vehicles in that the putative representative Plaintiffs, like all Class Members,

7    purchased or leased an Affected Vehicle designed, manufactured, and distributed

8    by the same Automaker Group. As previously noted, each of the Automaker

9    Groups' Keyless Fobs work in a nearly identical (if not completely identical)

10   manner. The representative Plaintiffs, like all Class Members, have been damaged

11   by FCA Group's misconduct in that Plaintiffs have, among other reasons, 1)

12   incurred a diminution in the value of his/her Affected Vehicle as a result of the

13   Defect, 2) overpaid for the Affected Vehicles as a result of the Defect, and 3)

14   incurred and continue to incur substantial risk as a result of the Defect and FCA

15   Group's refusal to remedy the Defect. Furthermore, the factual bases of FCA

16   Group's misconduct are common to all Class Members, or at least each Automaker

17   Group, and represent a common thread of misconduct resulting in injury to all

18   Class Members.

19   **C.    Adequate Representation**

20         195.   Plaintiffs will fairly and adequately represent and protect the interests

21   of each of their respective Classes. Plaintiffs have retained counsel with substantial

22   experience in prosecuting consumer class actions, including actions involving

23   defective vehicles.

24         196.   Plaintiffs and their counsel are committed to vigorously prosecuting

25   this action on behalf of the respective Classes, and have the financial resources to

26   do so. Neither Plaintiffs nor their counsel have interests adverse to those of the

27   proposed Classes.

28

**D.     Predominance of Common Issues**

197.   There are numerous questions of law and fact common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answer to which will advance resolution of the litigation as to all Class Members and/or state sub-classes. These common legal and factual issues include:

(a)     whether the Affected Vehicles suffer from the Defect;

(b)     whether the Defect constitutes an unreasonable safety risk;

(c)     whether FCA Group knew about the Defect, and, if yes, how long FCA Group has known of the Defect;

(d)     whether the defective nature of FCA Group's Affected Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase an Affected Vehicle;

(e)     whether FCA Group has a duty to disclose the defective nature of its Affected Vehicles to Plaintiffs and Class Members;

(f)     whether FCA Group omitted and failed to disclose material facts about its Affected Vehicles;

(g)     whether FCA Group's concealment of the true defective nature of its Affected Vehicles induced Plaintiffs and Class Members to act to their detriment by purchasing Affected Vehicles;

(h)     whether FCA Group omitted material facts about its Affected Vehicles' characteristics, uses, or benefits in violation of California's Consumer Legal Remedies Act ("CLRA") § 1770(a)(5);

(i)     whether FCA Group omitted material facts about its Affected Vehicles' standard, quality, or grade when they were of another, in violation of the CLRA § 1770(a)(7);

(j)     whether FCA Group omitted material facts about its Affected Vehicles in advertisements, in violation of the CLRA § 1770(a)(9);

(k)     whether FCA Group omitted material facts about the true defective nature of its Affected Vehicles, and if so, if those omissions were likely to mislead or deceive, and therefore were fraudulent, within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

(l)     whether FCA Group omitted material facts about the true defective nature of its Affected Vehicles such that the conduct was unfair within the meaning of Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

(m)     whether Plaintiffs and FCA Group are each "persons" as defined by Conn. Gen. Stat. Ann. § 42-110a(3);

(n)     whether FCA Group failed to disclose and/or actively concealed the Defect in its Affected Vehicles under Conn. Gen. Stat. Ann. § 42-110g(a) by (1) failing to state that Affected Vehicles have characteristics, uses, benefits, and qualities; (2) failing to state that Affected Vehicles are of a particular standard, quality, and grade; or (3) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer;

(o)     whether Plaintiffs and the Class are entitled to costs and attorneys' fees as a result of FCA Group's violation of the Connecticut Unfair Trade Practices Act as provided in Conn. Gen. Stat. Ann. § 42-110g(d);

(p)     whether FCA Group is and was at all relevant times a merchant with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1);

(q)     whether FCA Group failed to disclose and/or actively concealed the Defect in its Affected Vehicles under New York's General Business Law § 349 by representing that Affected Vehicles have characteristics, uses, benefits, and qualities which they do not have, representing that Affected Vehicles are of a particular standard and quality when they are not, advertising Affected Vehicles with the intent not to sell them as advertised, and otherwise engaging in conduct likely to deceive;

1    (r)    whether each of FCA Group's Affected Vehicles are a

2  commodity as defined by N.Y. Gen. Bus. Law § 350-a;

3    (s)    whether FCA Group failed to disclose and/or actively concealed

4  the Defect in its Affected Vehicles under N.Y. Gen. Bus. Law § 350 by omitting

5  material information;

6    (t)    whether Plaintiffs and the Class are entitled to recover their

7  actual damages or $500, whichever is greater, under N.Y. Gen. Bus. Law § 350

8    (u)    whether Plaintiffs and the Class are entitled to recover three

9  times actual damages, up to $10,000, because FCA Group acted willfully or

10  knowingly with respect to the Defect;

11    (v)    whether Plaintiffs and the other Class Members are entitled to a

12  declaratory judgment stating that FCA Group's Affected Vehicles are defective

13  and/or not merchantable;

14    (w)    whether Plaintiffs and the other Class Members are entitled to

15  equitable relief, including, but not limited to, a preliminary and/or permanent

16  injunction;

17    (x)    whether FCA Group have acted or refused to act on grounds

18  generally applicable to the Plaintiffs and State Classes, thereby making appropriate

19  final and injunctive relief with respect to each of the State Classes;

20    (y)    whether FCA Group should be declared financially responsible

21  for notifying all Class Members who own or lease its Affected Vehicles of the

22  Defect and for the costs and expenses of permanently remedying the Defect in its

23  Affected Vehicles; and

24    (z)    whether, under each state's law as named herein, if plaintiffs do

25  not have an adequate remedy at law, if they are entitled to equitable relief under an

26  unjust enrichment theory because of the benefit conferred on them by Plaintiffs

27  and other Class Members such that it would be inequitable, unconscionable and

28  unjust for FCA Group to retain that benefit.

## E.     Superiority

198.   Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of FCA Group's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

199.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Member's claims, it is likely that only a few Class Members could afford to seek legal redress for FCA Group's misconduct. Absent a class action, Class Members will continue to incur damages, and FCA Group's misconduct will continue without remedy.

200.   Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

## IX.     CAUSES OF ACTION

## A.     Claims Brought on Behalf of the California Class

### FIRST CAUSE OF ACTION

### Violation of California's Consumer Legal Remedies Act ("CLRA")
### (Cal. Civ. Code § 1750, *et seq*.)

201.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

202.   The below-listed Plaintiffs bring this cause of action for themselves and on behalf of the California Class. Specifically, Plaintiffs and putative class representatives Bernice Wimley and Oscar De Leon bring this claim against the FCA Group.

203.   FCA Group is a "person" as defined by the CLRA. Cal. Civ. Code § 1761(c).

204.   Plaintiffs and Class Members are "consumers" within the meaning of the CLRA. Cal. Civ. Code § 1761(d).

205.   By failing to disclose the defective nature of its Affected Vehicles to Plaintiffs and Class Members, FCA Group violated Cal. Civ. Code § 1770(a) because FCA Group failed to disclose that its Affected Vehicles were of a particular standard, quality, or grade. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

206.   FCA Group therefore committed unfair and deceptive acts or practices repeatedly in FCA Group's course of trade or business. Each omission was material, was capable of deceiving a substantial portion of the purchasing public, and imposed a safety risk on the public.

207.   FCA Group knew that its Affected Vehicles suffered from the Defect and thus were defectively designed or manufactured and were not suitable for their intended use.

208.   FCA Group was under a duty to Plaintiffs and Class Members to disclose the Defect and rectify it through Auto-Off prior to its Affected Vehicles' sale. Additionally:

(a)   the Defect is a safety hazard;

(b)   FCA Group was in a superior position to know the true state of facts about the Defect in its Affected Vehicles;

(c)   Plaintiffs and Class Members could not reasonably have been expected to learn or discover that the Affected Vehicles had the Defect until, at the earliest, the manifestation of the Defect; and

(d)   FCA Group knew that Plaintiffs and Class Members could not reasonably have been expected to learn or discover the Affected Vehicles' Defect prior to its manifestation.

209.   In failing to disclose the defective nature of its Affected Vehicles, FCA Group had exclusive knowledge of and/or knowingly and intentionally concealed material facts and breached their duty not to do so.

210.   The facts concealed and/or not disclosed by FCA Group are material in that a reasonable consumer would have considered them to be important in deciding whether or not to purchase or lease an Affected Vehicle. Had Plaintiffs and other Class Members known that the Affected Vehicles had the Defect, they would not have purchased or leased an Affected Vehicle.

211.   Plaintiffs and Class Members are reasonable consumers who do not expect their Affected Vehicles will experience the Defect. That is the reasonable and objective consumer expectation relating to the safe and normal operation of a vehicle.

212.   As a result of the conduct of FCA Group, Plaintiffs and Class Members have been harmed, creating a safety hazard, and causing Class Members to drive with dangerous Affected Vehicles that cannot be remedied without FCA Group taking action to repair the Defect.

213.   Plaintiffs and the Class are thus entitled to equitable relief.

214.   As a direct and proximate result of the unfair or deceptive acts or practices committed by FCA Group, Plaintiffs and Class Members also have suffered and will continue to suffer actual damages.

215.   Plaintiffs have provided FCA Group with proper notice of its alleged violations of the CLRA pursuant to Cal. Civ. Code § 1782(a), via letters sent to FCA Group and each of its registered agents for service of process on August 25, 2015. FCA Group has failed to provide the appropriate relief for its violations of the CLRA within 30 days of the date of the notification letter.[131]

---

[131] Certified mail return receipts indicate FCA Group received the letters by September 2, 2015, or earlier. The FCA Group failed to respond to the letters.

216.   Thus, in addition to equitable relief, pursuant to Cal. Civ. Code § 1782(a), Plaintiffs seek actual, statutory, and punitive damages as permitted under the CLRA (Cal Civ. Code §1750, et seq.) and applicable law.

## SECOND CAUSE OF ACTION

### Violation of California's Unfair Competition Law
### (Cal. Bus. & Prof. Code § 17200, *et seq.*)

217.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

218.   The below-listed Plaintiffs bring this cause of action for themselves and on behalf of the California Class. Specifically, Plaintiffs and putative class representatives Bernice Wimley and Oscar De Leon bring this claim against the FCA Group.

219.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." FCA Group engaged in conduct that violated each of this statute's three prongs.

220.   FCA Group committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, *et seq.,* when it violated the CLRA as alleged in the First Cause of Action, above.

221.   FCA Group committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it had exclusive knowledge and/or concealed the existence and nature of the Defect. The Defect presents a safety hazard for occupants of the Affected Vehicles.

222.   FCA Group committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it failed to provide a permanent remedy to fix the Defect once and for all in its Affected Vehicles.

223.   FCA Group committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, when it had exclusive

knowledge and/or concealed the existence and nature of the Defect. The exclusive knowledge and/or active concealment of the Defect by FCA Group is likely to mislead the public with regard to the true defective nature of its Affected Vehicles.

224.   FCA Group disseminated advertising that omitted material information in violation of Cal. Bus. & Prof. Code § 17200, *et seq.* and § 17500, *et seq.* when it had exclusive knowledge of and/or concealed the existence and nature of the Defect. This lack of disclosure deceived Plaintiffs and the public at large.

225.   The unfair or deceptive acts or practices of FCA Group occurred repeatedly in the course of its trade or business, and were capable of deceiving a substantial portion of the purchasing public.

226.   As a direct and proximate result of the unfair and deceptive practices committed by FCA Group, Plaintiffs and Class Members have suffered and will continue to suffer actual damages in the form of, among other things, reduced vehicle valuation and injuries capable of repetition.

227.   As a result of its unfair and deceptive conduct, FCA Group has been unjustly enriched and should be required to make restitution to Plaintiffs and Class Members pursuant to Cal. Bus. & Prof. Code §§ 17203 and 17204.

**THIRD CAUSE OF ACTION**

**Violation of Cal. Civil Code § 1710 Deceit and Common Law Fraud**

228.   Plaintiffs incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

229.   The below-listed Plaintiffs bring this cause of action for themselves and on behalf of the California Class. Specifically, Plaintiffs and putative class representatives Bernice Wimley and Oscar De Leon bring this claim against the FCA Group.

230.   Pursuant to California Civil Code § 1710, deceit is either (1) the suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) the assertion, as a fact, of that which is not true, by one who has no

1 reasonable ground for believing it to be true; (3) the suppression of a fact, by one

2 who is bound to disclose it, or who gives information of other facts which are

3 likely to mislead for want of communication of that fact; or (4) a promise, made

4 without any intention of performing it.

5      231.  FCA Group's actions constitute deceit under prong three (3) –

6 Fraudulent Concealment/Nondisclosure – identified in Paragraph directly above.

7      232.  Moreover, the Defect presents a safety hazard to Plaintiffs and Class

8 Members.

9      233.  FCA Group had exclusive knowledge of and/or fraudulently

10 concealed from and/or intentionally failed to disclose to Plaintiffs, the California

11 Class, and all others in the chain of distribution (e.g., concealments and omissions

12 in the Automakers' communications with wholesalers, retailers, and others in the

13 chain of distribution that were ultimately passed on to Plaintiffs and the California

14 Class) the true nature of its Affected Vehicles, which is that they contain the

15 Defect.

16      234.  Under California law, a duty to disclose arises in four circumstances:

17 (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the

18 defendant has exclusive knowledge of material facts not known to the plaintiff; (3)

19 when the defendant actively conceals a material fact from the plaintiff; and (4)

20 when the defendant makes partial representations but also suppresses some

21 material facts.

22      235.  FCA Group had a duty to disclose material facts regarding the true

23 nature of its Affected Vehicles pursuant to the second, third, and fourth prongs set

24 forth in the above paragraph:[132]

25

26

27

28
_____

[132] For a complete list of FCA Group's exclusive knowledge and/or active
concealment of the Defect, *see* ¶182(e)(iii), *infra*.

(a)     FCA Group had and has a duty to disclose material facts about its Affected Vehicles because FCA Group had exclusive knowledge of the true properties of its Affected Vehicles at the time of sale. The Defect is latent and not something that Plaintiff or Class Members could, in the exercise of reasonable diligence, have discovered independently prior to purchase.

(b)     FCA Group had and has a duty to disclose material facts about its Affected Vehicles because FCA Group undertook active steps to conceal them. Plaintiffs are aware of nothing in any of the Automakers' advertising, publicity, or marketing materials that discloses the truth about the Defect in its Affected Vehicles, despite ample evidence that FCA Group was aware of the problem by virtue of, if nothing else, numerous consumer complaints.

236.   The facts concealed and/or not disclosed by FCA Group to Plaintiffs and Class Members are material facts in that a reasonable person would have considered them important in deciding whether to purchase an Affected Vehicle.

237.   FCA Group intentionally concealed and/or failed to disclose the fact that its Affected Vehicles contain the Defect for the purpose of inducing Plaintiffs and Class Members to act thereon.

238.   Plaintiffs and the Class Members justifiably acted or relied to their detriment upon the concealed and/or non-disclosed facts as evidenced by their purchase or lease of the Affected Vehicles.

239.   Had Plaintiffs and Class Members known that the Affected Vehicles contained the Defect, they would not have purchased or leased an Affected Vehicle.

240.   As a direct and proximate cause of each of the misconduct of FCA Group, Plaintiffs and Class Members have suffered actual damages in that they bought or leased Affected Vehicles that do not perform safely, and they are now left with vehicles with reduced and diminished value in the marketplace.

241.  FCA Group has been and is wanton and/or reckless and/or shows a reckless indifference to the interests of others.

242.  FCA Group has acted with "malice" as that term is defined in Civ. Code § 3294(c)(1) by engaging in conduct that was and is intended by FCA Group to cause injury to the Plaintiffs and Class Members.

243.  FCA Group has committed "fraud" as that term is defined in Civ. Code § 3294(c)(3) through their concealment of material facts known to the FCA Group with the intent to cause injury to the Plaintiffs and Class Members.

244.  Plaintiffs, on behalf of themselves and all others similarly situated, demand judgment against FCA Group for actual and punitive damages in accordance with Civ. Code § 3294(a) for themselves and each member of the Class, plus attorneys' fees for the establishment of a common fund, interest, and costs.

### FOURTH CAUSE OF ACTION

### California False Advertising Law (FAL)
### (Bus. & Prof Code§ 17500 *et seq.*)

245.  Plaintiffs hereby incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

246.  The below-listed Plaintiffs bring this cause of action for themselves and on behalf of the California Class. Specifically, Plaintiffs and putative class representatives Bernice Wimley and Oscar De Leon bring this claim against the FCA Group.

247.  California Business and Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means

1  whatever, including over the Internet, any statement . . . which is untrue or

2  misleading, and which is known, or which by the exercise of reasonable care

3  should be known, to be untrue or misleading . . . .”

4      248.   FCA Group intended to sell or lease property (namely, its Affected

5  Vehicles) to induce the public to enter into any obligation relating to its Affected

6  Vehicles.

7      249.   FCA Group caused to be made or disseminated throughout the United

8  States, through advertising, marketing and other publications, statements that were

9  misleading due to material omissions, and which were known, or which by the

10 exercise of reasonable care should have been known to FCA Group, to be

11 misleading to consumers, Plaintiffs, and Class Members.

12     250.   FCA Group violated section 17500 because the omissions regarding

13 the Defect as set forth in this Complaint were material and likely to deceive a

14 reasonable consumer. In short, FCA Group publically disseminated advertising that

15 was misleading.

16     251.   Plaintiffs and Class Members have suffered injuries in fact, including

17 the loss of money or property (namely, the diminution in value of their Affected

18 Vehicles and/or overpayment for the same), as a result of the unfair, unlawful,

19 and/or deceptive practices committed by FCA Group. In purchasing or leasing

20 their Affected Vehicles, Plaintiffs and Class Members relied on the omissions of

21 the Automakers with respect to the safety of their vehicles. Had Plaintiffs and

22 Class Members known the truth of the Defect, they would not have purchased or

23 leased the Affected Vehicles and/or not paid as much for them.

24     252.   Accordingly, Plaintiffs and Class Members overpaid for the Affected

25 Vehicles and did not receive the benefit of their bargain. One way to measure this

26 overpayment, or lost benefit of the bargain, at the moment of purchase is by the

27 value consumers place on the vehicles now that the truth has been exposed. A

28

defective vehicle, by its very nature, is necessarily worth less than vehicles free of defects.

253.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of businesses by FCA Group. FCA Group is part of a pattern or generalized course of conduct that is still perpetuated and repeated nationwide.

254.   Plaintiffs and Class Members request that this Court enter such orders or judgments as may be necessary to enjoin FCA Group from continuing their unfair, unlawful, and/or deceptive practices, and for such other relief set forth herein.

**FIFTH CAUSE OF ACTION**

**Unjust Enrichment (Under California Law, in the Alternative, if the Court Determines the California Plaintiffs and the proposed California Class have no Adequate Remedy at Law under the California Plaintiffs' Other Named Causes of Action)**

255.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

256.   The below-listed Plaintiffs bring this cause of action for themselves and on behalf of the California Class. Specifically, Plaintiffs and putative class representatives Bernice Wimley and Oscar De Leon bring this claim against the FCA Group.

257.   FCA Group has been unjustly enriched by the purchases of its Affected Vehicles by Plaintiffs listed above.

258.   On behalf of all California Class Members who own or lease Affected Vehicles manufactured by FCA Group, the above-named Plaintiffs seek to recover from FCA Group under the equitable doctrine of unjust enrichment.

259.   The above-named Plaintiffs and the California Class Members unknowingly conferred a benefit on FCA Group, which knew of the Defect but failed to disclose same to Plaintiffs and the California Class Members.

260.   The circumstances are such that it would be inequitable, unconscionable and unjust to permit FCA Group to retain the benefit of these profits that it unfairly has obtained from the above-named Plaintiffs and the California Class Members.

261.   The above-named Plaintiffs and the California Class Members, having been damaged, are therefore entitled to recover or recoup damages as a result of the unjust enrichment of FCA Group.

**B.      Claims Brought on Behalf of the Connecticut Class**

### SIXTH CAUSE OF ACTION

**Violations of the Unfair Trade Practices Act**
**(Conn. Gen. Stat. Ann. §§ 42-110A, *et seq*.)**

262.   Plaintiffs incorporate by reference all preceding and foregoing allegations as though fully set forth herein.

263.   The below-listed Plaintiff brings this Count on behalf of the Connecticut Class. Specifically, Plaintiff and putative class representative Kevin Sisti, Jr. brings this claim against the FCA Group.

264.   Plaintiff and FCA Group are each "persons" as defined by Conn. Gen. Stat. Ann. § 42-110a(3).

265.   The Connecticut Unfair Trade Practices Act ("CUTPA") provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a). The CUTPA further provides a private right of action under Conn. Gen. Stat. Ann. § 42-110g(a).

266.   By failing to disclose and actively concealing the defects in the Keyless Fobs in its Affected Vehicles, FCA Group engaged in deceptive business practices prohibited by the CUTPA, including engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

267.   FCA Group knew that the Keyless Fobs in its Affected Vehicles were defectively designed or manufactured, would cause the Defect, and were not suitable for their intended use.[133] FCA Group nevertheless failed to inform Plaintiff about these Defects despite having a duty to do so.

268.   FCA Group owed Plaintiff a duty to disclose the defective nature of the Keyless Fobs in its Affected Vehicles, because FCA Group:

(a)     possessed exclusive knowledge of the Defect, rendering its Affected Vehicles more unsafe than similar vehicles; and/or

(b)     intentionally concealed the defects associated with Keyless Fobs through its deceptive marketing campaign.

269.   The unfair or deceptive acts or practices by FCA Group were likely to and did in fact deceive reasonable consumers, including Plaintiff, about the true safety and characteristics of the Keyless Fobs.

270.   As a result of its violations of the CUTPA detailed above, FCA Group caused actual damage to Plaintiff and, if not stopped, will continue to harm Plaintiff. Plaintiff currently owns or leases, or within the class period has owned or leased, an Affected Vehicle that is defective. Defects associated with the Keyless Fobs have caused the value of Affected Vehicles to decrease.

271.   Plaintiff and the Class sustained damages as a result of unlawful acts by FCA Group and are, therefore, entitled to damages and other relief as provided under the CUTPA.

272.   Plaintiff also seeks court costs and attorneys' fees as a result of the violation of the CUTPA by FCA Group as provided in Conn. Gen. Stat. Ann. § 42-110g(d). Upon filing, a copy of this Complaint will be mailed to the Attorney

---

[133] For a complete list of FCA Group's exclusive knowledge and/or active concealment of the Defect, *see* ¶182(e)(iii), *infra*.

General and the Commissioner of Consumer Protection of the State of Connecticut in accordance with Conn. Gen. Stat. Ann. § 42-110g(c).

## SEVENTH CAUSE OF ACTION

### Fraudulent Concealment
### (Based on Connecticut Law)

273.   Plaintiffs incorporate by reference all preceding and foregoing allegations as though fully set forth herein.

274.   The below-listed Plaintiff brings this Count on behalf of the Connecticut Class. Specifically, Plaintiff and putative class representative Kevin Sisti, Jr. brings this claim against the FCA Group.

275.   FCA Group had exclusive knowledge of and/or intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class Members information that is highly relevant to their purchasing or leasing decision.

276.   The Affected Vehicles purchased or leased by Plaintiff and the other Class Members were, in fact, defective, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Keyless Fobs without Auto-Off, as alleged herein.

277.   The aforementioned concealment was material because if it had been disclosed, Plaintiff and the other Class Members would not have bought or leased the Affected Vehicles, or would not have bought or leased those Vehicles at the prices they paid.

278.   The aforementioned representations were material because the omitted facts were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle. FCA Group knew that people had experienced the Defect. FCA Group intentionally omitted material information in order to sell Affected Vehicles.

279.   Plaintiff and the other Class Members relied on the reputation of FCA Group – along with the failure to disclose the faulty and defective nature of the Keyless Fobs without Auto-Off – in purchasing or leasing the Affected Vehicles.

280.   As a result of their reliance, Plaintiff and the other Class Members have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase or lease and/or the diminished value of their Affected Vehicles.

281.   The conduct of FCA Group was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class Members. Plaintiff and the other Class Members are therefore entitled to an award of punitive damages.

## EIGHTH CAUSE OF ACTION

**Unjust Enrichment (Under Connecticut Law, in the Alternative, if the Court Determines the Connecticut Plaintiffs and the proposed Connecticut Class have no Adequate Remedy at Law under the Connecticut Plaintiffs' Other Named Causes of Action)**

282.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding and foregoing paragraphs of this Complaint.

283.   The below-listed Plaintiff brings this cause of action for himself and on behalf of the Connecticut Class. Specifically, Plaintiff and putative class representative Kevin Sisti, Jr. brings this claim against the FCA Group.

284.   FCA Group has been unjustly enriched by the purchases or leases of its Affected Vehicles by Plaintiff listed above.

285.   On behalf of all Connecticut Class Members who own or lease Affected Vehicles manufactured by FCA Group, the above-named Plaintiff seeks to recover from FCA Group under the equitable doctrine of unjust enrichment.

286.   The above-named Plaintiff and the Connecticut Class Members unknowingly conferred a benefit on FCA Group, which knew of the Defect but failed to disclose same to Plaintiff and the Connecticut Class Members.

287.   The circumstances are such that it would be inequitable, unconscionable and unjust to permit FCA Group to retain the benefit of these profits that it unfairly has obtained from the above-named Plaintiff and the Connecticut Class Members.

288.   The above-named Plaintiff and the Connecticut Class Members, having been damaged, are therefore entitled to recover or recoup damages as a result of the unjust enrichment of FCA Group.

**C.   Claims Brought on Behalf of the New York Class**

### NINTH CAUSE OF ACTION

**Violations of New York General Business Law § 349**
**(N.Y. Gen. Bus. Law § 349)**

289.   Plaintiffs incorporate by reference all preceding and foregoing allegations as though fully set forth herein.

290.   The below-listed Plaintiff brings this Count on behalf of the New York Class. Specifically, Plaintiff and putative class representative Mark Pastarnack brings this claim against the FCA Group.

291.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

292.   In the course of the business of FCA Group, it willfully failed to disclose and actively concealed the dangerous risk of the Keyless Fobs without Auto-Off in Affected Vehicles as described above. Accordingly, FCA Group engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in N.Y. Gen. Bus. Law § 349, including engaging in conduct likely to deceive.

293.   The actions of FCA Group as set forth above occurred in the conduct of trade or commerce.

294.   Because the deception by FCA Group takes place in the context of automobile safety, the deception affects the public interest. Further, the unlawful

conduct by FCA Group constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

295.   FCA Group proximately caused injuries to Plaintiff and the other Class Members.

296.   Plaintiff and the other Class Members were injured as a result of the conduct by FCA Group in that Plaintiff and the other Class Members overpaid for their Affected Vehicles and did not receive the benefit of their bargain, and their Affected Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of the omissions of FCA Group.

## TENTH CAUSE OF ACTION

### Breach of Implied Warranty of Merchantability
### (N.Y. U.C.C. § 2-314)

297.   Plaintiffs incorporate by reference all preceding and foregoing allegations as though fully set forth herein.

298.   The below-listed Plaintiff brings this Count on behalf of the New York Class. Specifically, Plaintiff and putative class representative Mark Pastarnack brings this claim against the FCA Group.

299.   FCA Group is and was at all relevant times merchants with respect to motor vehicles.

300.   A warranty that the Affected Vehicles were in merchantable condition is implied by law in the instant transactions.

301.   These Affected Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which they are used. Specifically, the Affected Vehicles are inherently defective in that the Keyless Fobs lack Auto-Off, a dangerous safety defect that can cause (and has caused) numerous injuries and deaths.

302.   FCA Group was provided notice of these issues by numerous complaints filed against it, including the instant Complaint, and by numerous individual letters and communications sent by Plaintiff and the Class.[134]

303.   As a direct and proximate result of the breach of the warranties of merchantability by FCA Group, Plaintiff and the Class have been damaged in an amount to be proven at trial.

**ELEVENTH CAUSE OF ACTION**

**Fraudulent Concealment**
**(Based on New York Law)**

304.   Plaintiffs incorporate by reference all preceding and foregoing allegations as though fully set forth herein.

305.   The below-listed Plaintiff brings this Count on behalf of the New York Class. Specifically, Plaintiff and putative class representative Mark Pastarnack brings this claim against the FCA Group.

306.   FCA Group had and has exclusive knowledge of and/or intentionally concealed the above-described material safety and functionality information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class Members information that is highly relevant to their purchasing or leasing decision.

307.   The Affected Vehicles purchased or leased by Plaintiff and the other Class Members were, in fact, defective, unsafe, and unreliable because the Affected Vehicles contained faulty and defective Keyless Fobs without Auto-Off, as alleged herein.

308.   The Automakers had a duty to disclose that its Affected Vehicles were defective, unsafe, and unreliable in that the Keyless Fobs caused the Defect,

---

[134] For a complete list of FCA Group's exclusive knowledge and/or active concealment of the Defect, *see* ¶182(e)(iii), *infra*.

1    because FCA Group had exclusive knowledge and/or actively concealed that

2    Keyless Fobs without Auto-Off are dangerous and defective.

3      309.    The aforementioned concealment was material because if it had been

4    disclosed, Plaintiff and the other Class Members would not have bought or leased

5    the Affected Vehicles, or would not have bought or leased those Vehicles at the

6    prices they paid.

7      310.    Plaintiff and the other Class Members relied on the reputation of FCA

8    Group – along with the failure to disclose the faulty and defective nature of the

9    Keyless Fobs without Auto-Off – in purchasing or leasing the Affected Vehicles.

10      311.    As a result of their reliance, Plaintiff and the other Class Members

11    have been injured in an amount to be proven at trial, including, but not limited to,

12    their lost benefit of the bargain and overpayment at the time of purchase or lease

13    and/or the diminished value of their Affected Vehicles.

14      312.    The conduct of FCA Group was knowing, intentional, with malice,

15    demonstrated a complete lack of care, and was in reckless disregard for the rights

16    of Plaintiff and the other Class Members. Plaintiff and the other Class Members

17    are therefore entitled to an award of punitive damages.

18               **TWELFTH CAUSE OF ACTION**

19    **Unjust Enrichment (Under New York Law, in the Alternative, if the Court**
**Determines the New York Plaintiffs and the proposed New York Class have**

20    **no Adequate Remedy at Law under the New York Plaintiffs' Other Named**
**Causes of Action)**

21

22      313.    Plaintiffs hereby incorporate by reference the allegations contained in

     the preceding and foregoing paragraphs of this Complaint.

23

24      314.    The below-listed Plaintiff brings this cause of action for himself and

     on behalf of the New York Class. Specifically, Plaintiff and putative class

25

26      representative Mark Pastarnack brings this claim against the FCA Group.

27      315.    The FCA Group has been unjustly enriched by the purchase or lease

28    of the Affected Vehicle by Plaintiff and Class Members.

316.   On behalf of all New York Class Members who own or lease Affected Vehicles manufactured by FCA Group, the above-named Plaintiff seeks to recover from FCA Group under the equitable doctrine of unjust enrichment.

317.   The above-named Plaintiff and the New York Class Members unknowingly conferred a benefit on FCA Group, which knew of the Defect but failed to disclose same to Plaintiff and the New York Class Members.

318.   The circumstances are such that it would be inequitable, unconscionable and unjust to permit FCA Group to retain the benefit of these profits that it unfairly has obtained from the above-named Plaintiff and the New York Class Members.

319.   The above-named Plaintiff and the New York Class Members, having been damaged, are therefore entitled to recover or recoup damages as a result of the unjust enrichment of FCA Group.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class Members, pray that the Court enter judgment against FCA Group, as follows:

(a)   An order certifying the proposed State Classes, designating Plaintiffs as named representatives of the relevant Class and/or Sub-classes, and designating the undersigned as Class Counsel;

(b)   A declaration that the lack of Auto-Off in FCA Group's Affected Vehicles is defective;

(c)   A declaration that FCA Group is financially responsible for notifying all Class Members about the defective nature of its Affected Vehicles due to the lack of Auto-Off;

(d)   An order requiring FCA Group to notify all State Class and Sub-class Members that his/her Affected Vehicle lacks Auto-Off, a potentially deadly safety defect;

1         (e)     An order requiring FCA Group to permanently repair its

2  Affected Vehicles so that they no longer possess the Defect;

3         (f)     An order requiring FCA Group to include Auto-Off in any

4  newly-produced vehicles with Keyless Ignitions so that they no longer possess the

5  Defect;

6         (g)     An award to Plaintiffs and Class Members of compensatory,

7  exemplary, and statutory damages, including interest, in an amount to be proven at

8  trial;

9         (h)     A declaration that FCA Group must disgorge, for the benefit of

10  Plaintiffs and Class Members, all or part of the ill-gotten profits they received from

11  the sale or lease of its Affected Vehicles, or make full restitution to Plaintiffs and

12  Class Members;

13         (i)     An award of attorneys' fees and costs, as allowed by law;

14         (j)     An award of attorneys' fees and costs pursuant to Cal. Code

15  Civ. P. § 1021.5;

16         (k)     An award of pre-judgment and post-judgment interest, as

17  provided by law;

18         (l)     An injunction under Rule 23(b)(2) barring FCA Group from

19  selling future vehicles with the Defect;

20         (m)    An injunction under Rule 23(b)(2) requiring FCA Group to

21  institute Auto-Off in all Affected Vehicles;

22         (n)     Leave to amend this Complaint to conform to the evidence

23  produced at trial; and

24         (o)     Such other relief as may be appropriate under the

25  circumstances.

## DEMAND FOR JURY TRIAL

27      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial

28  by jury of any and all issues in this action so triable of right.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: November 25, 2015

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By */s/ Lee M. Gordon*
    Lee M. Gordon (SBN 174168)
Elaine T. Byszewski (SBN 222304)
301 N. Lake Avenue, Suite 203
Pasadena, CA 91101
Telephone: (213) 330-7150
lee@hbsslaw.com
elaine@hbsslaw.com

Martis Alex (SBN 77903)
Daniel R. Leathers *(pro hac vice to be sought)*
Brian R. Morrison *(pro hac vice to be sought)*
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
malex@labaton.com
dleathers@labaton.com
bmorrison@labaton.com

Steve W. Berman *(pro hac vice to be sought)*
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: 206-623-7292
Facsimile: 206-623-0594
steve@hbsslaw.com